Miriam RODWAY et al., Appellants,

v.

The UNITED STATES DEPARTMENT
OF AGRICULTURE et al.

No. 74–1303.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 5, 1975.

Decided June 12, 1975.

Ronald F. Pollack, New York City, with whom Roger A. Schwartz, New York City, and John R. Kramer, Washington, D. C., were on the brief, for appellants.

Raymond J. Coughlan, Jr., Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., and John A. Terry, Robert M. Werdig, Jr., and David G. Larimer, Asst. U. S. Attys., were on the brief, for appellees.

Before WRIGHT, McGOWAN and WILKEY, Circuit Judges.

Opinion for the court filed by Circuit Judge WRIGHT.

Statement concurring in the result and in Parts I and II of the court's opinion filed by Circuit Judge WILKEY.

J. SKELLY WRIGHT, Circuit Judge:

Plaintiffs-appellants challenge the coupon allotment system established by the United States Department of Agriculture (USDA) to implement the directive of the Food Stamp Act, 7 U.S.C. §§ 2011–2025, that food stamp recipients be given "an opportunity to obtain a nutritionally adequate diet * * *." *Id.* § 2013(a). *See also id.* §§ 2011, 2014(a), 2016(a). We find that the Secretary of Agriculture violated the procedural requirements of Section 4 of the Administrative Procedure Act (APA), 5 U.S.C. § 553 (1970), in promulgating the coupon allotment system, that the system is therefore void as promulgated, and that the case must be remanded to the Secretary for new proceedings.

I

The Food Stamp Act (the Act) was first passed in 1964. Its purposes were to distribute the agriculture surplus of this nation in a beneficial manner, to safeguard the health and well-being of our citizens, and to raise the level of nutrition among low-income households. 7 U.S.C. § 2011 (1964). The Act allows eligible recipients to purchase food stamps (coupons) at prices significantly below their face value. The stamps, in turn, may be used at face value to purchase food at certain retail stores. The cost of the coupons for each household is variable; the Act directs that it "shall represent a reasonable investment on the part of the household, but in no event more than 30 per centum of the household's income * * *." 7 U.S.C. § 2016(b). The original Act directed the

Secretary of Agriculture (the Secretary) to administer the program so that "eligible households * * * shall be provided with an opportunity *more nearly* to obtain a nutritionally adequate diet through the issuance to them of a coupon allotment * * *." 7 U.S.C. § 2013(a) (1964) (emphasis added). In 1971, however, the Act was amended and this language was significantly altered. The italicized words "more nearly" were deleted from the Act, so that the Secretary's duty became to provide food stamp recipients "with an opportunity to obtain a nutritionally adequate diet * * *." 7 U.S.C. § 2013(a). *See also id.* §§ 2011, 2014(a), 2016(a). Essentially, it is the effect of this change that is here at issue.

Following the 1971 amendments, the Secretary published notice of a proposed rule-making, 36 Fed.Reg. 7240 (1971), inviting comments from interested parties. New regulations, all dealing with the administration of the program, not with the size of the coupon allotments, were issued on July 29, 1971. *Id.* at 14102–14117. New coupon allotments were issued on April 16 and 17, *id.* at 7273, 7320–7321, and reissued in slightly revised form on July 29, 1971. *Id.* at 14118–14120. The coupon allotment system was based on the cost to a hypothetical family of four[1] of the so-called Economy Food Plan, the least costly of five "family food plans" developed by USDA.[2] The allotment for this hypothetical family was $108 per month, with allotments ranging from $32 per month for a family of one person to $180 per month for a family of eight persons.

For each person over eight $16 was added to the monthly allotment.[3] *Id.* at 14118. The allotments thus reflected the economies of scale that would benefit larger households.

Plaintiffs-appellants began this litigation in December 1971, seeking declaratory and injunctive relief because of the Secretary's alleged violations of the Food Stamp Act. The individual appellants are members of nine low-income households, all of which receive food stamps. They sue on behalf of themselves and others similarly situated. The other appellants are the City of New York, the Commonwealth of Pennsylvania, and the National Welfare Rights Organization and its affiliates. In District Court appellants charged the Secretary was violating the Act in two ways:[4] (1) the Secretary's Economy Food Plan allegedly did not provide a nutritionally adequate diet and so its use violated the Act; and (2) the allotment system, because it was based on an average family and on average food prices and preferences, and because it did not continually reflect the current cost of food, did not provide all food stamp recipients with the opportunity to purchase even the Economy Food Plan. Complaint, ¶¶ 6 & 9, App. 9a–11a. In addition, appellants sought a preliminary injunction to prevent implementation of the new coupon allotments because they raised the cost of the coupons significantly, increasing the burden on low-income families. This request for preliminary relief was withdrawn when USDA rolled back its price increases on January 26, 1972. 37 Fed.Reg. 1180.

1. The hypothetical family consists of a man and a woman, 20–35 years of age, a child 6–9 years of age, and a boy 9–12 years of age. Deposition of Dr. Robert L. Rizek at 112, Appendix (App.) at 167a. The composition of the family is extremely important because the amount, and kind, of food necessary to provide a nutritionally adequate diet for an individual varies dramatically according to the individual's age, sex, health, and physical activity. App. 287a.

2. The five plans are economy, low-cost, low-cost for families who are high consumers of cereal products, moderate-cost, and liberal. Affidavit of H. Rex Thomas, App. 93a.

3. The allotment figures are adjusted semi-annually. The current figures allow $46 for a family of one person, $154 for a family of four, and $266 for a family of eight. For each person over eight $22 is added to the monthly allotment. 39 Fed.Reg. 40520–40521.

4. Jurisdiction was asserted under 28 U.S.C. §§ 1331, 1337, 1361 (1970), under 5 U.S.C. § 702 (1970), and under 11 D.C.Code § 521 (1973). *See* Peoples v. United States Department of Agriculture, 138 U.S.App.D.C. 291, 294, 427 F.2d 561, 564 (1970).

On April 7, 1972 USDA submitted, with supporting documents, a motion to dismiss or, in the alternative, for summary judgment. App. 113a. The District Court granted appellees' motion for summary judgment on July 7, 1972, holding that the Secretary's price rollback had mooted the controversy. App. 251a–252a. On appeal, this court reversed the District Court and remanded the case for further proceedings. Rodway v. United States Department of Agriculture, 157 U.S.App.D.C. 133, 482 F.2d 722 (1973). We held:

.While the rollback in the price increases for stamps removed this cause of complaint and rendered this issue moot, it did not alter or render moot the more substantial claim that the allotment levels established by USDA failed to satisfy the requirements of the Act.

157 U.S.App.D.C. at 137, 482 F.2d at 726.

On remand, the District Court sought to narrow the issues so as to permit a final adjudication. Thereupon, appellants submitted a motion for partial summary judgment, App. 273a, accompanied by a statement of material facts not in dispute, App. 276a–292a, and a statement of genuine issues, App. 293a–298a. USDA filed a supplemental memorandum in support of its motion for summary judgment. App. 299a–301a. Without hearing oral argument, the District Court, on December 12, 1973, granted USDA's motion for summary judgment and denied appellants' motion for partial summary judgment. Rodway v. United States Department of Agriculture, D.D.C., 369 F.Supp. 1094 (1973). Appellants again appealed to this court.

At oral argument it became apparent that the Secretary's compliance with the procedural requirements of the APA in promulgating the allotment regulations was a substantial issue in this case, although it had not been raised in the District Court or in the prior appeal to this court. On their face the regulations had seemingly been promulgated without notice, solicitation of comments, or issuance of a basis and purpose statement. See 5 U.S.C. § 553. Accordingly, we ordered the parties to respond in writing to a list of questions probing the consequences of this apparent omission.[5] Now the parties have provided their answers. We find that the Secretary has indeed failed to comply with the requirements of the APA, and that the failure is fatal to the asserted validity of the allotment regulations.

II

All parties agree that the APA would not, by its own terms, govern the issuance of the allotment regulations. Expressly exempted from the procedural requirements of Section 4 are any matters "relating to * * * public property, loans, grants, benefits, or contracts." 5 U.S.C. § 553(a)(2). The food stamp program would appear to be a matter relating to public "grants" or "benefits," thereby exempting rules relating to the program from the APA. See Rodriguez v. Swank, N.D.Ill., 318 F.Supp. 289 (1970), affirmed, 403 U.S. 901, 91 S.Ct. 2202, 29 L.Ed.2d 677 (1971) (A.F.D.C. benefits excluded). See generally Bonfield, Public Participation in Federal Rulemaking Relating to Public Property, Loans, Grants, Benefits, or Contracts, 118 U.Pa.L.Rev. 540 (1970).

---

5. The questions were:
 1. Was the analysis promised by the Secretary in 36 Fed.Reg. 14102 (1971) made and published?
 2. If made and published, does the analysis meet the requirements of the Administrative Procedure Act, 5 U.S.C. § 553(d) (1970), for a statement of reasons? See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).
 3. If such an analysis was not issued, are the regulations therefore invalid? Can the subsequent affidavits taken of officials of the Department of Agriculture in the District Court proceeding provide the necessary statement of reasons?
 4. If the analysis was not made and published, what effect does this fact have on subsequent regulations based on the regulations published at 36 Fed.Reg. 14102?

Order, March 6, 1975.

■ On July 24, 1971, however, as a result of a recommendation of the Administrative Conference of the United States, USDA promulgated a regulation making the procedural requirements of Section 4 of the APA applicable to all of its rule-making relating to "public property, loans, grants, benefits, or contracts." The regulation was effective immediately. 36 Fed.Reg. 13804. It is, of course, well settled that validly issued administrative regulations have the force and effect of law. *See, e. g.,* Morton v. Ruiz, 415 U.S. 199, 235, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974); Vitarelli v. Seaton, 359 U.S. 535, 539–540, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); Service v. Dulles, 354 U.S. 363, 388, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957). Thus the regulation fully bound the Secretary to comply thereafter with the procedural demands of the APA. The allotment regulations here at issue were promulgated five days later, on July 29, 1971. 36 Fed.Reg. 14118–14120.

■ USDA does not argue that it was not bound by the regulation of July 24, 1971,[6] but rather suggests that it has indeed complied fully with the APA in its promulgation of the allotment procedures. However, even a superficial examination of the challenged regulations and USDA's purported manner of compliance shows this to be untrue. The APA requires an agency to provide the public with notice of proposed rules, an opportunity to comment upon them, and "a concise general statement of their basis and purpose" that justifies the rules in light of the comments received. 5 U.S.C. § 553. In promulgating its allotment regulations, USDA followed none of these requirements.

■ To show its compliance with the APA, USDA points to the procedures surrounding its adoption of various rules for the administration of the food stamp program. For these rules, there was notice soliciting comments published on April 16, 1971, 36 Fed.Reg. 7240, final rules incorporating changes suggested by comments received published on July 29, 1971, *id.* at 14102–14117, and a subsequent analysis of the comments received published on October 16, 1971, *id.* at 20145–20148. Nonetheless, the answer to USDA's argument is short: however procedurally proper the adoption of these rules, they did not concern in any way the allotment regulations that are the subject of this lawsuit. The proposed rule-making dealt with a vast number of rules necessary for administration of the program. Proposed rules outlined the participation of state agencies, individual households, wholesale and retail food stores, and banks. Plans were proposed for emergency food assistance for disaster victims, and procedures were outlined for adminstrative and judicial review of USDA actions. But of the basic ingredient of the program, the allotments system, there was not a word. *See* 36 Fed. Reg. 7240–7254. Admittedly, the notice was framed broadly:

> Notice is hereby given that the [USDA] intends to revise the regulations governing the operation of the Food Stamp Program for the purpose of incorporating the applicable provisions of [the 1971 amendments].

*Id.* at 7240. The provisions that followed, however, were only the proposed administrative regulations described above. Such notice is insufficient to include the allotment system by inference. Section 4 of the APA is clear in its demands: the notice must include "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). The notice appearing at 36 Fed.Reg. 7240 does not meet this requirement so far as the allotment system is concerned.[7]

---

**6.** USDA does assert that the regulation does not apply to its rule-making proceedings in the spring of 1971, an assertion with which we have no dispute but which is essentially irrelevant to the validity of regulations issued after July 24, 1971. *See* USDA Supplemental Memorandum at 2 n.1.

**7.** The same day the notice appeared, USDA published elsewhere in the *Federal Register* al-

 USDA essentially admits as much by arguing in the alternative that notice was unnecessary because the legislative history of the 1971 amendments makes clear that Congress knew the Secretary would use the Economy Food Plan and family of four averaging system. Thus

> [i]t is clear that all interested persons were on actual notice, without the formal issuance of a Notice *in haec verba,* of the Secretary's intention in this regard. See 5 U.S.C. § 553(b).

USDA Supplemental Memorandum at 4. While 5 U.S.C. § 553(b) does exempt from the formal notice requirement situations where "persons subject [to the proposed regulations] are named and either personally served or otherwise have actual notice thereof in accordance with law," the exception plainly does not apply to this case. Appellants, of course, were named nowhere. Moreover, they did not have actual notice. Even if the legislative history fully supported the Secretary's view of the law, it cannot seriously be asserted that the congressional debates provided more than constructive notice to appellants. Only publication in the *Federal Register* meets the APA requirement of constructive notice. If the notice requirement of the

APA could be avoided by reference to inferential discussions obscurely placed throughout various federal publications, much of the salutory purpose of the procedural rule-making requirements of the APA would be vitiated. Absent actual notice, the public should be held accountable only for notice plainly set forth in the *Federal Register*. By this standard, USDA's asserted notice must fail.

Having failed to comply with the first procedural requirement of informal rule-making, USDA in due course failed to comply with the other two. Since there was no notice, there was no solicitation of comments. Unremarkably, no comments on the allotment regulations were received. And, when the revised allotment figures were promulgated on July 29, 1971, they were accompanied by no basis and purpose statement. 36 Fed. Reg. 14118–14120. USDA relies on the analysis that finally was produced for those administrative regulations that were a product of orderly rule-making. But that analysis dealt, again unremarkably, only with the comments received concerning those regulations.[8] *See* 36 Fed.Reg. 20145–20148. Thus, as for the allotment regulations, the APA procedures were ignored from start to finish.[9]

---

lotment regulations substantially identical with those here at issue. 36 Fed.Reg. 7273. *See also id.* at 7320–7321. These regulations cannot, however, be construed as notice of the subsequent rules since they were effective in their own right upon publication.

**8.** One sentence in the published "analysis" appears generally to concern the allotment regulations:

> No changes were made in the basis of issuance tables in view of the provisions of the Food Stamp Act and in order to provide for work incentives and maintain consistency with the proposed family assistance program.

36 Fed.Reg. 20148. Even if that sentence dealt fully with the substance of appellants' complaint, which it in fact addresses only inferentially, it is not a sufficient statement of basis and purpose to show that the agency engaged in reasoned decision-making or to provide an adequate basis for appellate review. *See* Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 444 F.2d 841 (1970), cert.

denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). *See also* Wright, The Courts and the Rulemaking Process: The Limits of Judicial Review, 59 Cornell L.Rev. 375, 381 (1974). And, of course, even if the sentence were fully adequate it would not remedy the deficiencies caused by the absence of notice and comment rule-making.

**9.** While these regulations were substantially identical with regulations published a few months earlier, *see* note 7 *supra,* at a time when the APA requirements did not apply to the food stamp program, USDA has not suggested that this prior publication somehow relieves the regulations here at issue of the notice and comment procedures of the APA. Indeed, it could not so argue, since it is apparent on the face of its rule announcing future compliance with the APA that all rules promulgated after July 24, 1971 would have to meet the APA standards. *See* 36 Fed.Reg. 13804. Since the challenged regulations were issued on July 29, 1971, they plainly fall within the terms of USDA's self-imposed rule.

■■ While not conceding the invalidity of its procedures, USDA argues that we may look beyond the administrative record (or nonrecord) to find the justification for its allotment regulations. Specifically the Department suggests that the affidavits of two USDA officials offered to the District Court in this litigation may provide the equivalent of a basis and purpose statement. Without passing on whether the affidavits contain sufficient explanation to pass muster as a basis and purpose statement,[10] we find them inadequate for two more fundamental reasons. First, courts have traditionally looked with hostility upon explanations of agency officials submitted in affidavit form during the course of litigation. These *"post hoc rationalizations"* are typically found to be an inadequate basis for review. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 419, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Burlington Truck Lines v. United States, 371 U.S. 156, 168–169, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 (1943). Appellees rely on two cases where exceptions to this general rule were made. These cases, however, only show why an exception would be inappropriate in this case and bring us to the second reason for refusing to accept the affidavits as a substitute basis and purpose statement. In Citizens to Preserve Overton Park v. Volpe, *supra,* the Supreme Court did rec-

ognize the possibility that the District Court could require the Secretary of Transportation to explain in court his reasons for approving the routing of a highway through a city park. But in *Overton Park* there was a full administrative record; only the Secretary's explanation was lacking.[11] In Aguayo v. Richardson, 2 Cir., 473 F.2d 1090, 1103 (1973), the procedural requirements of the APA did not apply, so no administrative record was available. The Second Circuit was forced to make do with the inferences from the papers on which the Secretary of Health, Education, and Welfare had acted and with "the largely unhelpful documents prepared specifically for this litigation." *Id.* (footnote omitted).[12] Here, unlike *Overton Park,* there is no full administrative record on which to base review, but, unlike *Aguayo,* an administrative record is required. Thus we see no reason to depart from the well settled rule that litigation affidavits are an unacceptable basis for appellate review of agency decision-making.

■ The absence of an administrative record has significance apart from the doubt it casts upon after-the-fact explanations. Even if the proffered affidavits did provide an acceptable explanation of the Secretary's decision, it would be an explanation of a decision reached without the comments of interested parties. Not only would appellants' com-

---

This is not to suggest, however, that once allotment regulations are promulgated in compliance with APA procedures, those procedures must be followed for every semi-annual allotment adjustment mandated by the Act. 7 U.S.C. § 2016(a). So long as the adjustment is purely a statistical calculation involving no change in underlying policy, the Secretary may properly exempt those proceedings from the notice and comment requirements if he can

> for good cause [find] * * * that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

5 U.S.C. § 553(b)(B).

**10.** Appellants hotly contest the sufficiency of the affidavits on this ground, as well as on the two mentioned in text. Appellants' Responses

to Court's Questions and Supporting Memorandum of Law at 31–49.

**11.** The Court did note that "[s]uch an explanation will, to some extent, be a *'post hoc* rationalization' and thus must be viewed critically." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 420, 91 S.Ct. 814, 826 (1971). Moreover, the Court rejected reliance upon litigation affidavits such as are offered by appellees here. *Id.* at 419, 91 S.Ct. 814.

**12.** From the phrase quoted above, the court dropped the following footnote:

> As noted in *Overton Park,* * * * such affidavits are "merely 'post hoc' rationalizations" for administrative action, and cannot be given great weight.

Aguayo v. Richardson, 2 Cir., 473 F.2d 1090, 1103 n.20 (1973).

ments have been ignored, but the comments of those who might have responded to a general published notice would have been bypassed as well. The basis and purpose statement is not intended to be an abstract explanation addressed to imaginary complaints. Rather, its purpose is, at least in part, to respond in a reasoned manner to the comments received, to explain how the agency resolved any significant problems raised by the comments, and to show how that resolution led the agency to the ultimate rule.[13] Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 444 F.2d 841 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971); Portland Cement Assn v. Ruckelshaus, 158 U.S.App.D.C. 308, 486 F.2d 375 (1973). The basis and purpose statement is inextricably intertwined with the receipt of comments. Thus we think the Secretary's failure to solicit comments on his allotment regulations is, by itself, fatal to their validity. His present explanations cannot address comments never received. Moreover, the absence of comments makes the appellate function impossible. The APA requires the reviewing court to "review the whole record" in measuring the validity of agency action. 5 U.S.C. § 706 (1970). The whole record in an informal rule-making case is comprised of comments received, hearings held, if any, and the basis and purpose statement. In this case, there is

plainly no whole record to review and the District Court could not perform its appellate function.[14]

■ In sum, the Secretary failed to comply with the procedural command of the APA in promulgating allotment regulations for the food stamp program. This failure cannot be cured by litigation affidavits because, as *post hoc* rationalizations, they are unacceptable substitutes for a contemporaneous basis and purpose statement and because they do not provide a "whole record" to review. Accordingly, we find the regulations are invalid as promulgated.[15] This case must be reversed and remanded to the District Court, which in turn must return it to the Secretary for a rule-making proceeding in compliance with the APA.

In so holding, however, we are mindful of the critical importance of the allotment regulations to the functioning of the entire food stamp system, on which over ten million American families are now dependent to supplement their food budgets. Thus we do not order the regulations vacated pending the rule-making proceedings. Rather, they must continue in effect, and the Secretary must continue to make the cost-of-living adjustments mandated by the Act, 7 U.S.C. § 2016(a), until validly promulgated regulations can take their place. However, we think that transition should occur with expedition. In matters as vital as

---

**13.** This purpose is patent on the face of the statute:

> After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. *After consideration of the relevant matter presented,* the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. * * *

5 U.S.C. § 553(c) (emphasis added).

**14.** In this circuit the District Court has jurisdiction under the APA to review agency action when "there is no other adequate remedy in a court * * *." 5 U.S.C. § 704 (1970). *See* Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859 (1970). Appellants asserted this provision as a basis for ju-

risdiction, *see* note 4 *supra,* and, since the Food Stamp Act does not otherwise provide for judicial review of the Secretary's rule-making activities, *cf.* 7 U.S.C. § 2022, the District Court was consequently empowered by the APA to review the rules here at issue.

**15.** Under somewhat similar circumstances, the Sixth Circuit recently found agency rule-making unlawful under the APA, holding:

> The Administrator built no record in approving or disapproving the state plans. He took no comments, data, or other evidence from interested parties, nor did he articulate the basis for his actions. This failure contravenes the explicit dictates of Section 553 of the APA and renders meaningless the judicial review provisions of Section 706.

Buckeye Power, Inc. v. EPA, 6 Cir., 481 F.2d 162, 171 (1973).

basic nutrition there is no excuse for delay, especially when this litigation has already dragged on for over three years. Accordingly, we order the Secretary to complete the new rule-making process within 120 days of the issuance of this opinion.

## III

 Since this case must be remanded for a new rule-making proceeding, we have no occasion to address the substantive validity of the present regulations. Whether the Economy Food Plan provides the basis for a nutritionally adequate diet is plainly a factual question within the Secretary's expertise. While we can review his ultimate determination to see whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law * *," 5 U.S.C. § 706(1)(A), we can offer him no guidance at this point in making that initial determination.[16] On the other hand, appellants' second claim—that the Secretary's allotment system, including use of the hypothetical family of four, is invalid because it does not provide all recipients with the opportunity to purchase a nutritionally adequate diet— presents mixed questions of fact and law. We think it will help expedite the administrative process to address the questions of law at this time. Those questions are assuredly before us, having been properly brought to the District Court, decided there, and now brought to this court by appellants. And resolution of this issue now will provide substantial guidance to the Secretary as he attempts to formulate new regulations.

 Once the Secretary determines what constitutes a nutritionally adequate diet, the Economy Food Plan or something else, any distribution mechanism must necessarily comport with the demands of the Act. We think it plain that the Food Stamp Act requires the Secretary to distribute the food stamp coupons in such a way that all, or at least virtually all, recipients are given the "opportunity to obtain a nutritionally adequate diet * * *." 7 U.S.C. § 2013(a). We reach this conclusion from the face of the statute itself, and from its legislative history.

The statute offers no suggestion that any distribution system that offered significant numbers of recipients less than that necessary to purchase a nutritionally adequate diet would be acceptable. Congress found substantial malnutrition in America and sought to alleviate it. 7 U.S.C. § 2011. The food stamp program was designed to permit "low-income households to purchase a nutritionally adequate diet through normal channels of trade." Id. That the program would offer recipients this opportunity is repeated again and again throughout the Act. Id. §§ 2013(a), 2014(a), 2016(a). We find no suggestion on the face of the Act, or any reason to impute one, that the opportunity is not to be offered to all eligible recipients.[17]

This conclusion is bolstered by reference to the legislative history. Most sig-

---

16. We do note, however, that it is an insufficient basis for that determination for the Secretary to assert that Congress knew he would utilize the Plan when it passed the 1971 amendments. Congress ordered the opportunity to achieve a "nutritionally adequate diet," not the opportunity to purchase the Economy Food Plan. While there are frequent references to the Plan in the legislative history, Congress was acting only on the Secretary's representations that the Plan would be the basis for a nutritionally adequate diet. It did not attempt to evaluate those representations, and it did not incorporate them into the statutory standard. Thus the Secretary must find support for the Plan in fact, not in the legislative history. Cf. note 19 infra.

17. See, e. g., 7 U.S.C. § 2016(a):

The face value of the coupon allotment which State agencies shall be authorized to issue to any households certified as eligible to participate in the food stamp program shall be in such amount as the Secretary determines to be the cost of a nutritionally adequate diet * * *.

(Emphasis added.) The italicized word "any" was added, without comment, to this provision by the 1971 amendments. See H.R.Rep. No. 91–1402, 91st Cong., 2d Sess., 22 (1970); S.Rep. No. 91–292, 91st Cong., 1st Sess., 14 (1969).

nificant is the change, mentioned earlier, from the promise of the 1964 Act, "an opportunity *more nearly* to obtain a nutritionally adequate diet" to that of the 1971 amendments, "an opportunity to obtain a nutritionally adequate diet." At the same time, the purpose of the Act was changed from "raising levels of nutrition" to enabling eligible households "to purchase a nutritionally adequate diet." *See* H.R.Rep. No. 91–1402, 91st Cong., 2d Sess., 14 (1970), 1970 U.S.Code Cong. & Admin.News, p. 6025. The changes were the result of an Administration proposal. *See* 115 Cong.Rec. 11669 (1969) (President's message). In support of the changes, then Secretary of Agriculture Hardin testified before a House committee:

> In short, we are proposing that the food stamp program be revised so that stamp purchase requirements are realistic—so that they encourage the poor to purchase a nutritious diet rather than discourage their participation in this program. Under the present law, the food stamp program is designed only to help participants improve their diet. *There is no assurance that a participating family can meet its minimum nutritional needs. We are proposing a program that will allow participants to obtain at least a nutritionally adequate diet.*

Hearings on H.R. 12430 and H.R. 12222 Before the House Committee on Agriculture, 91st Cong., 1st Sess., Serial Q, Part 1, at 8 (1969) (emphasis added). Secretary Hardin also testified before a Senate Committee:

> As the President stated in his message, the total food stamp allotment shall be equivalent to the cost of [a] nutritionally complete diet. \* \* \* This would represent a new commitment on the part of the Congress and the Executive. *It makes of the food stamp program what it should be—an instrument to assure an adequate diet to all our low-income families.*

> This has not been true in the past. The purchase requirement was designed to maintain a family's normal level of food expenditure but the value of the bonus coupons was not sufficient to assure *all* food stamp families that, in total, they would have sufficient food purchasing power to buy an adequate diet.

Hearings on S. 6, S. 339, S. 1608, S. 1864, and S. 2014 Before the Senate Committee on Agriculture and Forestry, 91st Cong., 1st Sess., 389 (1969) (emphasis added). The Administration's proposed deletion of the phrase "more nearly" was accepted without opposition; congressional debate centered on whether offering recipients merely an "opportunity" to purchase a nutritionally adequate diet was itself sufficient.[18] While the Senate version of the 1971 amendments adopted a more substantial base for allotments, the House stayed with the Administration proposal, and the Senate finally agreed at conference. In explaining to the Senate why the conferees had settled on the House version, Senator Miller made it quite clear that a nutritious diet for all recipients was intended, no matter what the cost:

> The conference report contains the language of the House bill, which is simply that an adequate and nutritious

---

**18.** Congress debated whether merely giving eligible households the *opportunity* to purchase a nutritionally adequate diet by issuance of coupons representing the dollar value of that diet was meaningful when, it was claimed, only a trained dietician could use that amount to purchase such a diet. Untrained shoppers would spend substantially more to purchase a diet of equal nutritional value, thus making the proposed allotments insufficient for the needs of most recipients. The Senate version of the Act would have based allotments on the cost of USDA's low-cost food plan, *see* note 2 *su-* pra, thereby providing more leeway for consumer ignorance. *See* Senate Hearings on S. 6, S. 339, S. 1608, S. 1864, and S. 2014 Before the Senate Committee on Agriculture and Forestry, 91st Cong., 1st Sess., 269 (1969) (supplemental statement of Sen. McGovern); 115 Cong.Rec. 26852 (1969) (statement of Sen. McGovern); H.R.Rep. No. 91–1402, *supra* note 17, at 31 (dissenting views of Reps. Foley and Lowenstein); 116 Cong.Rec. 42006 (1970) (statement of Rep. Foley); *id.* at 44164 (statement of Rep. Poage).

diet will be provided for. It so happens that the way the Department of Agriculture is administering this program today, an adequate and nutritious diet for a family of four is deemed to cost around $106 a month. But, as the House conferees pointed out, *they did not care whether it cost $50, $100, or $150; whatever it cost must provide for an adequate and nutritious diet.* * * *

\* \* \* \* \* \*

I attempted to get the two sides together by suggesting that we split the difference [between the House and Senate versions] and go to about $121 as our starting point, and I thought at one time that the House conferees were going to agree, but finally they refused to agree, and *they said the adequate and nutritious diet provision in their bill meant exactly what it said, nothing more and nothing less,* and refused to budge on it.

116 Cong.Rec. 44440–44441 (1970) (emphasis added).

■ We are thus convinced by the language of the statute and by the legislative history that the 1971 amendments marked a major shift in the policy of the Food Stamp Act, a shift from supplementing the diets of low-income households to *guaranteeing* those households the opportunity for an adequate diet. Congress plainly intended the 1971 amendments to assure that no eligible family need go malnourished; the Government would provide all the opportunity to be healthfully fed. Manifestly, that congressional intent is frustrated if the food stamp program is administered in such a way that a substantial number of eligible households do not receive sufficient coupons to purchase what the Secretary determines to be a nutritionally adequate diet.[19] For a family that needs a loaf of bread, the offer of a slice is poor comfort. We think such an administrative system would violate the Act.

While we have no need to determine whether the present administrative system, based on the cost of a nutritionally adequate diet for a hypothetical family of four, complies with the Act,[20] we shall outline the showing necessary to support such a system.[21] At oral argument

**19.** After explaining the House-Senate compromise in the language quoted above, Sen. Miller added:

[B]ut I will say that if the Department of Agriculture does not administer this program in a way which meets not only the letter but the spirit of the language "adequate and nutritious[,]" I shall be happy to join with anyone in trying to do something about that, because it will be frustrating the clearly expressed intention of Congress.

116 Cong.Rec. 44441 (1970).

**20.** The District Court upheld the present allotment system as follows:

It may be, as plaintiffs allege, every household, because of its particular composition, will not receive under the program a diet which is exactly equivalent in nutritional adequacy to the diet which some other household of similar size would receive. Such disparities, as plaintiffs allege, may result from the age, sex, health and physical activity of the household members. However, in the area of economics and social welfare, a classification does not fail on equal protection grounds because it is imperfect. It does not offend the Constitution simply because "the classification 'is not

made with mathematical nicety or because in practice it results in some inequality.' . . . The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970).

Rodway v. United States Department of Agriculture, D.D.C., 369 F.Supp. 1094, 1098 (1973). While we do not quarrel with the District Court's view of the equal protection clause, we must observe that this case concerns statutory construction, not constitutional interpretation. That the allotment regulations may be constitutional does not, of course, imply that they comport with the dictates of the Food Stamp Act.

**21.** USDA appears to argue that a showing is unnecessary because the legislative history of the Food Stamp Act demonstrates congressional approval of the four-person family averaging system. Brief of appellee USDA at 21. *Cf.* note 16 *supra.* We disagree. Undoubtedly, Congress knew the Secretary was using the hypothetical family of four. *See, e.g.,* H.R. Rep. No. 91–1793, 91st Cong., 2d Sess., 8 (1970); S.Rep. No. 91–292, *supra* note 17, at 25 (individual views of Sen. McGovern). But

USDA conceded that the present system results in the individual appellants receiving substantially less than that necessary for them to purchase even the Economy Food Plan.[22] In part this is so because, by USDA's own figures, the cost (and composition) of a nutritionally adequate diet varies according to an individual's age and sex.[23] The allotment regulations, however, do not consider age

there is no indication that Congress ever became aware of the issues raised in this lawsuit; rather, it simply used figures for a family of four, which were supplied by the Secretary and uncontested, as a basis for comparison of various food plans and levels of funding. The family of four is nowhere mentioned in the statute itself, and there is no suggestion in the legislative history that had Congress been aware of the effect of the Secretary's system it would have approved it. We think to defer to the inferences the Secretary draws from such scanty supportive material would be to disserve legislative intent, for we think the Congress intended nothing more in this regard than that its statute be followed.

**22.** *See* note 24 *infra.*

**23.** The Secretary's own figures for various ages and sexes follow:

Cost of Food at Home Estimated for the Economy Food Plan [1]
September 1971, U. S. Average

| Sex-age groups [2] | Cost for— | |
|---|---|---|
| | 1 Week | 1 Month |
| **FAMILIES** | Dollars | Dollars |
| Family of two, 20–35 years [3] | 15.00 | 65.10 |
| Family of two, 55–75 years [3] | 12.30 | 53.40 |
| Family of four, preschool children [4] | 21.70 | 94.50 |
| Family of four, school children [5] | 25.30 | 109.70 |
| **INDIVIDUALS** [6] | | |
| Children, under 1 year | 2.90 | 12.60 |
| 1–3 years | 3.70 | 16.10 |
| 3–6 years | 4.40 | 19.20 |
| 6–9 years | 5.40 | 23.30 |
| Girls, 9–12 years | 6.10 | 26.50 |
| 12–15 years | 6.80 | 29.30 |
| 15–20 years | 6.90 | 29.90 |
| Boys, 9–12 years | 6.30 | 27.20 |
| 12–15 years | 7.40 | 31.90 |
| 15–20 years | 8.50 | 36.80 |
| Women, 20–35 years | 6.30 | 27.40 |
| 35–55 years | 6.10 | 26.30 |
| 55–75 years | 5.20 | 22.30 |
| 75 years and over | 4.70 | 20.30 |
| Pregnant | 7.50 | 32.60 |
| Nursing | 8.80 | 38.00 |
| Men, 20–35 years | 7.30 | 31.80 |
| 35–55 years | 6.80 | 29.50 |
| 55–75 years | 6.00 | 26.20 |
| 75 years and over | 5.60 | 24.40 |
| Per person [7] | 6.10 | 26.30 |

[1] Costs for the Economy Plan are estimated at 80 percent of the cost for the Low-cost Plan. Quantities of major food groups in these plans were published in *Family* Economics Review, October 1964. In estimating costs for the Low-cost Plan, selections of foods within groups and prices paid were based on these urban households with incomes of $2,000 to $2,999 surveyed in spring 1965. Survey prices were updated to the reporting period by the change in "Estimated Retail Food Prices by Cities" released by the Bureau of Labor Statistics.

[2] Persons of the first age listed up to but not including the second age.

[3] Ten percent added for family size adjustment.

[4] Man and woman, 20 to 35 years; children 1 to 3 and 3 to 6 years.

and sex at all. Rather they calculate the cost of the Plan for a family composed of two adults, ages 20–35, one child, age 6–9, and one boy, age 9–12. Deposition of Dr. Robert L. Rizek at 112, App. 167a. Thereafter, this cost is adjusted only for the *number* of persons in each eligible household, without regard to its individual composition. Thus every four-person household receiving food stamps receives the same amount each month—that necessary to feed the hypothetical family of four—although some households need substantially more than the hypothetical family of four and some need substantially less.

USDA's failure to account for the composition of each recipient household by age and sex is not the only reason why appellants receive less than they need to purchase a nutritionally adequate diet. The recipient's health and the amount of his daily physical activity also influence the cost to him of a nutritionally adequate diet. The fact that, in accordance with the Act, 7 U.S.C. § 2016(a), the Secretary adjusts the allotment figures for inflation only twice a year, and in so doing uses cost of food data current six months prior to the effective date of the new allotment schedules, means that the actual cost of the Economy Food Plan is frequently higher than the allotment even for the hypothetical family of four. Moreover, appellants are all from Northeastern states where the cost of food is higher than the national average, which the Secretary uses in pricing the Economy Food Plan.

All this the Secretary concedes.[24] He defends the allotment system not on its accuracy but on the ground of administrative necessity.[25] He further sug-

[5] Man and woman, 20 to 35 years; child 6 to 9; and boy 9 to 12 years.

[6] Costs given for persons in families of 4. For other size families, adjust thus: 1-person, add 20 percent; 2-person, add 10 percent; 3-person, add 5 percent; 5-person, subtract 5 percent; 6-or-more person, subtract 10 percent.

[7] Plan for an average person in the civilian population (1960).

App. 88½a.

24. At oral argument USDA conceded that its administration of the food stamp system resulted, as of Aug. 1973, in the following discrepancies between the nutritional needs of appellants' households and their allotment under the present system:

| Appellant and Household Size | Monthly Cost of Economy Food Plan | Monthly Coupon Allotment | Monthly Difference |
|---|---|---|---|
| Rodway (11) | $410.24 | $248 | $162.24 |
| McKnight (11) | 407.46 | 248 | 159.46 |
| Hollis (9) | 294.34 | 216 | 78.34 |
| Robinson (8) | 286.90 | 200 | 86.90 |
| Butler (8) | 276.64 | 200 | 76.64 |
| Walker (3) | 125.11 | 94 | 31.11 |
| Angiletta (8) | 281.60 | 200 | 81.60 |
| McArthur (3) | 129.75 | 94 | 35.75 |
| James (7) | 271.92 | 180 | 91.92 |

App. 284½a. Thus USDA concedes that appellants receive an average of 32% less than that necessary for them to have an opportunity to purchase what the Secretary determined to be a nutritionally adequate diet, an opportunity Congress guaranteed appellants in the Food Stamp Act.

25. 12. It is not administratively practicable to provide for the determination of a coupon allotment for each household participating in the program on the basis of the actual composition of each household taking into consideration such factors as the age, health, sex, and degree of physical activity of each household member even though such factors to some degree affect the total nutritional needs of a household. To do so would require the obtaining and verification of substantial amounts of additional information

gests that appellants' allotments fall short because they are members of "unusual families." Brief for appellee USDA at 21. We agree that there is room for administrative convenience and necessity in the administration of the food stamp program. The number of variables affecting the needs of individual recipients is, ultimately, infinite, and we certainly do not expect the Secretary to embark upon extensive metabolic examinations of each food stamp recipient to determine individual need. But we do not think that justifies automatically ignoring generalized, easily quantified, and easily verified differences among recipients under the rubric of administrative necessity.[26] The purposes of the Food Stamp Act—the health and well-being of our populace—are too important, and the legislative intent that those purposes be achieved for substantially all recipients too clear, for us to allow their administrative evisceration. We think that an averaging system such as that now used can be sustained only if the Secretary can show that such a system will deliver coupons to substantially all recipients sufficient to allow them to purchase a nutritionally adequate diet.[27] If such an "efficient" system does not meet this test, which we think is congressionally mandated, then the Secretary must individualize his computations to the extent necessary to achieve this result, or increase the amount of the "average" allotment so that virtually all recipients are swept within it. And, needless to

from applicant households in order to certify their eligibility and more frequent recertifications, for example, at the birthday of each household member to insure that the changing ages were resulting in the appropriate increases or decreases in the household's coupon allotment. To this end, the Department has tried to reduce, rather than add to, the complexity of the certification process and to simplify rather than complicate the judgments which must be made by certifying officials to insure that the certification process itself does not present a barrier to the participation of eligible households. Therefore, after reviewing available data on the typical composition of poverty families by age and sex, coupon allotments were established on the basis of household size alone, taking into account that large households should be able to buy food more economically than small households. The available data concerning such economies of scale, particularly for the largest households which participate in the program—some in excess of 15 members—are limited. Again to minimize the calculations for caseworkers, and thus speed up the certification process, the revised regulations allow the caseworker to quickly calculate the coupon allotment for the largest households by adding to the published allotment for an eight-person household the uniform amount of $16 for each member in the household in excess of eight. On the basis of the limited information available on the economies of scale, and the fact that large-size households typically contain many school-age children receiving school lunch benefits, I determined that these allotments are sufficient to provide a nutritionally adequate diet.
Affidavit of Richard E. Lyng, Assistant Secretary of Agriculture for Marketing and Consumer Services, App. 106a–108a.

26. While USDA suggests that quantification of age and sex variables would require substantial amounts of additional data from recipient households and frequent and complex recertifications of households, see note 25 supra, we are not, at least in the absence of a factual record, immediately convinced. USDA already requires state agencies to certify eligible households as to income and number of family members. 7 C.F.R. § 271.4 (1974). Typically, a household must be recertified every three months; no household may be certified for more than 12 months. Id. § 271.4(a)(4). To add to this the burden of certifying household members' ages and sexes does not seem to us intolerable. And as for the problem of constant recertification, upon which USDA places much emphasis, sex is unchanging, and the ages of all recipients can be adjusted administratively each year, so that no recertification is necessary.

The variables of inflation and the differential price of food in different parts of the country are already quantified by the Government itself. Adjustment for these figures in a system that works largely through individual state programs does not seem difficult.

The variables of health and individual physical activity may be more difficult to quantify in any efficient manner, but we would expect the Secretary on remand to inquire diligently into the significance of these variables, as well as any others of import raised by the comments, and the possibility of their quantification.

27. In such a case the Secretary must necessarily be able to show why appellants are members of "unusual families." Brief for appellee USDA at 21.

824

say, whatever approach is utilized must be supported by the administrative record developed on remand.

Further than this we do not go. We express no view on what allotment system is to be preferred, or, should an individualized approach be used, how many variables should be accommodated. That is initially to be determined by the Secretary, and we think a proper determination must await the presentation of facts not now before us. But we stress that the Secretary must make an active inquiry into the facts and must take whatever steps are required to comply with the legislative mandate. The nation's poor and low-income families who are so dependent on the relief promised by the Food Stamp Act deserve no less.

Accordingly, this case is remanded to the District Court with instructions to return it to the Secretary for a new rule-making proceeding.

So ordered.

WILKEY, Circuit Judge:

I concur in the result and in Parts I and II of the court's opinion. I respectfully suggest that Part III is dicta, and whether it is all helpful dicta may be problematical.