**CONCERNED ABOUT TRIDENT et al., Appellants,**

v.

**Donald H. RUMSFELD, Individually and as Secretary of the Department of Defense, et al. (two cases).**

Nos. 75–1515, 75–2053.

United States Court of Appeals, District of Columbia Circuit.

Argued May 21, 1976.

Decided Oct. 13, 1976.

As Amended July 13, 1977.

David Sive, New York City, with whom Ronald J. Wilson, Washington, D.C., was on the brief for appellants.

Carl Strass, Atty., Dept. of Justice, Washington, D.C., with whom Peter R. Taft, Asst. Atty. Gen., Irwin L. Schroeder, Jr., and Edmund B. Clark, Attys., Dept. of Justice, Washington, D.C., were on the brief for federal appellees. Wallace H. Johnson, Asst. Atty. Gen., Washington, D.C., at the time the record was filed, also entered an appearance for Federal appellees.

Raymond M. Momboisse, Sacramento, Cal., with whom Ronald A. Zumbrun, Sac-

ramento, Cal., John H. Midlen, Jr., and Glenn E. Davis, Washington, D.C., were on the brief for appellee, Pacific Legal Foundation.

Kenneth A. MacDonald, Seattle, Wash., filed a brief on behalf of American Friends Service Committee as amicus curiae in 75-2053 urging reversal.

Before TAMM and LEVENTHAL, Circuit Judges and KAUFMAN,* United States District Judge for the District of Maryland.

Opinion PER CURIAM.

Opinion by Circuit Judge TAMM.

Concurring opinion filed by Circuit Judge LEVENTHAL.

PER CURIAM: .

The opinion of Judge Tamm is an opinion for the Court. While Judges Leventhal and Kaufman concur generally in that opinion, they wish to express certain refinements on the reasoning. In these respects the opinion of Judge Leventhal is also an opinion for the Court.

TAMM, Circuit Judge.

The appellants here, Concerned About Trident, et al. raise questions concerning the adequacy of the environmental impact statement (EIS) prepared under the supervision of the Navy for its newest atomic missile submarine system (Trident), located in Bangor, Washington.[1] In addition, they contend that the Navy failed to follow proper procedures (e.g. failed to weigh the environmental costs of a dedicated site versus its benefits to the public) mandated by the National Environmental Policy Act of

1969 (hereinafter referred to as NEPA). 42 U.S.C. § 4321 et seq. (1970). The district court found that the EIS and Navy procedures fully complied with the mandates of NEPA and therefore dismissed the complaint.[2] After a thorough review of the voluminous record in this case, we must agree that the Navy decisionmaking process and the EIS satisfy NEPA in all respects save two. For the reasons set forth, we affirm in part, reverse in part, and remand for a more extended discussion and consideration by the Navy of alternatives to the dedicated site system and their environmental impacts, along with further study by the Navy of the impacts which will be generated by the Trident program after 1981.

I

The history of Trident (called "ULMS" prior to May 16, 1972) begins in 1966 when the Department of Defense began a secret study of alternative systems of nuclear deterrence (Strat–X Study). The Strat-X Study Report recommended in 1967 that a hardened silo-base missile system, when combined with a new submarine-launched ballistic-missile system, was preferable to the other candidate systems examined. In February, 1968, the Deputy Chief of Naval Operations ordered research and development of Trident to begin along the lines of the Strat-X Report.[3] The aim of Trident is to maintain the superiority and survivability of the United States' sea-based nuclear deterrent force in the face of anticipated Soviet anti-submarine warfare improvements over the next few decades. Trident is essentially a further development of the presently deployed Polaris/Poseidon nuclear-powered ballistic-missile submarines which are central to the strategic deterrent force of the United States.[4]

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

1. The environmental impact statement was prepared pursuant to section 102(2)(C) of the National Environmental Policy Act of 1969. 42 U.S.C. § 4321 et seq. (1970).

2. Id.

3. In 1972 the Trident Refit Complex Study Report and Trident Alternative Refit Concepts reevaluated the conclusion of the Strat-X Study that a single integrated refit complex was necessary for Trident support. These studies reaffirmed the single base decision reached in the Strat-X Study Report as the only method of

those studied capable of accomplishing Trident's goal of a high at-sea time to in-port time ratio. Finding of Fact No. 71; J.A. 726a–27a.

4. In addition to greater survivability, the new Trident system will contain such technological improvements over the Polaris/Poseidon system as quieter operation, increased efficiency, and easier maintenance. Each Trident submarine will be capable of carrying 24 intercontinental ballistic missiles (8 more than Polaris/Poseidon submarines), will be 560 feet long (135 feet longer than the largest Polaris/Poseidon), and will carry the 4,000 mile range missile (a range of 1,500 more miles than that of Poseidon). Finding of Fact No. 31; J.A. at 706a–07a.

In order to achieve the key survivability prerequisite, the new system incorporated the use of a complete logistical support/refit facility (known as a "dedicated site"). All tasks necessary for the maintenance, repair, and support of the Trident submarines will be performed at this single dedicated base so that the submarines will spend as little time as possible away from the safety of deep water. The location of this dedicated site was the focus of studies beginning in 1970. Eighty-nine potential sites were initially reviewed. The studies took into consideration the operational requirements of the submarine, the capability of the base to support the Trident missile, the amount of environmental disturbance, and the availability of sufficient land. Meanwhile, the Deputy Secretary of Defense tentatively scheduled the deployment of Trident for 1981. This deployment date was subsequently re-set for various periods ranging from 1975 to sometime in the early 1980's. On December 23, 1971, the Secretary of Defense designated 1978 as the first firm date for the initial deployment of Trident.[5]

By 1972 the original 89 potential sites had been reduced to 19 nominees. Finding of Fact No. 59; J.A. at 719a–20a. Candidate environmental impact statements were then prepared when it became apparent that four sites were capable of supporting the Trident Program. The district court found that the decisionmakers took into account the environmental assessments laid forth in the candidate EIS's in arriving at their final site selection. Finding of Fact No. 74; J.A. at 728a–29a. The overwhelming strategic and tactical advantages of locating Trident on the Pacific dictated that the Defense Department choose Bangor, Washington, the only one of the four remaining sites located on the Pacific Ocean. Once the site had been tentatively selected, an in-depth environmental assessment of the impacts that Trident would have on the Bangor community commenced. Construction did not begin until the Navy was convinced in August of 1974, after reviewing the final EIS, that the environmental disturbance which would be caused by Trident did not outweigh the military benefits which Trident would achieve for the country.[6]

5. By the time the Final Environmental Impact Statement was completed, the Navy had revised this target date from 1978, to 1981, and finally to 1983. By 1983 then, 100 percent of all military, and civilian employees should be on the job at the Trident base. Preface, Final Environmental Impact Statement, Trident Support Site, Bangor, Washington, July, 1974 (hereinafter referred to as the Final EIS).

6. The district court specifically found that the following environmental assessments and statements were prepared during the time that the Trident project was under consideration by the decisionmakers:
A. The Trident Program
 1. Environmental Impact Statement Assessment, April 12, 1971.
 2. Candidate Environmental Impact Statement (CEIS) for ULMS, March 31, 1972 (Ex. 7).
B. The Trident Ship System
 1. Environmental Impact Assessment, July, 1973 (Ex. 9).
 2. CEIS, Trident Project Ship System, November 30, 1973 (Ex. 32).
 3. Environmental Impact Assessment, December 29, 1973 (Ex. 33).
C. The Trident Submarine
 1. CEIS, March 31, 1972 (Ex. 7).
D. The Trident Weapons System
 1. Environmental Impact Assessment, July, 1974 (Ex. 8A).

 2. Updated Environmental Impact Assessment, February, 1975 (Ex. 8B).
E. The Nuclear Reactor
 1. Draft Environmental Impact Statement, August 25, 1972 (Ex. 10).
 2. Final Environmental Impact Statement, December 27, 1972 (Ex. 10).
F. Typical Trident Refit Facility
 1. CEIS, March 31, 1972 (Ex. 7).
G. Trident Support Site, Bangor, Washington
 1. CEIS, February 10, 1972 (Ex. 14).
 2. CEIS, February 8, 1973 (Ex. 18).
 3. Preliminary Draft EIS, December 17, 1973 (Ex. 4).
 4. Preliminary Draft EIS, February, 1974 (Ex. 3).
 5. Draft EIS (5 Volumes), March 21, 1974 (Ex. 2).
 6. Final EIS (5 Volumes), July 19, 1974 (Ex. 1).
H. Potential Trident Support Sites
 1. CEIS, St. Mary's, Georgia, February 10, 1972 (Ex. 12).
 2. CEIS, St. Mary's, Georgia, February 10, 1973 (Ex. 19).
 3. CEIS, Charleston, South Carolina, March 6, 1972 (Ex. 13).
 4. CEIS, Charleston, South Carolina, February 10, 1973 (Ex. 20).
 5. CEIS, Cape Kennedy, Florida, February 10, 1972 (Ex. 15).
 6. CEIS, Cape Kennedy, Florida, February 10, 1973 (Ex. 21).

The Navy signed a contract on June 22, 1973, with a number of firms massed together under the title of the Trident Joint Venture. This group of firms undertook the task of preparing three reports for the Navy concerning the support site—the Preliminary Engineering Studies, the Preliminary Master Plan, and the Environmental Impact Statement. The Navy instructed the Joint Venture to pay close attention to environmental considerations in its interdisciplinary approach to planning for this project. As a result of this admonition, several technical changes were made in the engineering plans in order to ameliorate the environmental impact of certain base facilities.[7] The Joint Venture submitted two preliminary EIS's in 1973 to the Navy and local officials and sought their comments. A more complete Draft EIS of 1974 was sent to all appropriate federal, state, and local agencies and was made available to the public. A public hearing on this document produced numerous oral and written comments which were incorporated, along with appropriate responses, into the Final EIS. With the submission to the Council on Environmental Quality on June 19, 1974, of the Final EIS, the district court found that

[t]he Navy had then completed preparation of Environmental Impact Assessments, Candidate EIS's or Draft and Final EIS's, as appropriate, on every action involved in the Trident Program.

Finding of Fact No. 99; J.A. at 739a.

I. Trident Wharf and Turning Basin
 1. Draft EIS, March 9, 1973 (Ex. 163).
 2. Final EIS, December 10, 1973 (Ex. 11).
J. Trident Office Building, Bangor, Washington
 1. Environmental Impact Assessment, December 10, 1973 (Ex. 23).
K. Indian Island Conventional Ordinance Facility
 1. CEIS, November, 1974 (Ex. 24).
Finding of Fact No. 100; J.A. at 739a–41a.

7. For example, the Joint Venture changed the design of offshore facilities to incorporate pile-supported structures so that the salmon migrations could continue to utilize the shallow water near the shore. Finding of Fact No. 82; J.A. at 733a.

8. Final EIS, vol. I, Figure 14.

9. These community characteristics, along with many others, are set out in the Final EIS and the impact of Trident on each trait is also analyzed. The impact analysis is broken down

In addition to this brief history of Trident, it is necessary to keep in mind some of the broad characteristics of the community chosen for this dedicated support site. Bangor, Washington is located in Kitsap County on the Kitsap Peninsula in the Puget Sound Basin between the Olympic and Cascade Mountain Ranges in Northwestern Washington. It is a semi-rural area with one small city and a population density of 259 persons per square mile. When Trident reaches its deployment stage, an estimated 30,000 people will be added to the Kitsap area. The Trident Program will occupy approximately 7,000 acres on the Hood Canal in the Puget Sound Basin, Kitsap County. The support site is being built at an existing naval installation (Bangor Annex) which has been used by the Navy primarily as an ammunition depot. The land within the boundaries of the Bangor Annex is presently planned for industrial use by the Kitsap County comprehensive plan.[8] No more land need be acquired for the dedicated site. The Kitsap community is generally recognized as stable and lower-middle to middle-class. The county's economy depends to a great extent upon the employment generated by naval installations.[9]

## II

■ The Navy raises several preliminary arguments to the effect that its action is completely free from the strictures of NEPA and court review.[10] The only one

into the following sections: social impact, economic impact, transportation impact, visual quality impact, historical and archeological impact, air quality impact, water resources and geologic impact, flora impact, fauna impact, noise impact, utilities impact, radiological impact, and other operational impacts. See Final EIS, vol. I at i-xi.

10. The standing issue which the Navy raises was clearly and properly decided by the district court. J.A. at 754a–55a. It found that the organizational appellant, Concerned About Trident, is a non-profit corporation formed for the primary purpose of taking all steps necessary to prevent the construction and operation of the proposed Trident project. 145 of its members live in Kitsap County. Hood Canal Environmental Council, another appellant, is also a non-profit corporation which is interested in the proper management of the natural resources of the Hood Canal area. It has 165 members living in Kitsap County. The other organizational appellants, (Friends of the Earth, Washington Environmental Council, and

which merits any extended discussion is the rather cursory argument that "NEPA cannot possibly apply" to strategic military decisions made by the Department of Defense-Navy.[11] Appellees' Brief at 7–9. We view this as a flagrant attempt to exempt from the mandates of NEPA all such military actions under the overused rubric of "national defense". This effort to carve out a defense exemption from NEPA flies in the face of the clear language of the statute, Department of Defense and Navy regulations, Council on Environmental Quality ("CEQ") Guidelines, and case law.

█ Section 10? of NEPA clearly instructs *all* federal a *g*encies to comply with its requirements. 2 U.S.C. § 4332 (1970). The only time that a federal agency can avoid this inclusion is when a clear and unavoidable conflict in statutory authority exists. *See Flint Ridge Dev. Co. v. Scenic Rivers Association,* 426 U.S. 776, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976). The Navy has pointed to no existing specific statutory authority prohibiting compliance with NEPA in this case or making such compliance impossible. That compliance with NEPA is mandatory absent such an explicit exception is further supported by CEQ Guidelines:

> The phrase "to the fullest extent possible" in section 102 is meant to make clear that each agency of the Federal Government shall comply with that section unless existing law applicable to the agency's operations expressly prohibits or makes compliance impossible.

40 C.F.R. § 1500.4(a) (1975); by Department of Defense regulations:

§ 214.1 Purpose.

This Part 214 reiterates and amplifies DoD policy, responsibilities, and procedures for assessing the environmental impact of Defense actions on the quality of the human environment as required by Pub.L. 91–190 [NEPA] . . . .

§ 214.2 Applicability and scope.

(a) The provisions of this Part 214 apply to the Office of the Secretary of Defense, the Military Departments, the Organization of the Joint Chiefs of Staff, Unified and Specified Commands, and Defense Agencies . . . .

32 C.F.R. § 214.1–2 (1975); and by our own decision in *Calvert Cliffs' Coordinating Committee, Inc. v. AEC,* 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971) ("*Calvert Cliffs'*"):

> NEPA, first of all, makes environmental protection a part of the mandate of *every* federal agency and department.

*Id.* at 1112 (emphasis added).

There is no support in either the statute or the cases for implying a "national defense" exemption from NEPA. *See Natural Resources Defense Council, Inc. v. Morton,* 148 U.S.App.D.C. 5, 458 F.2d 827, 836 (1972); *Committee for Nuclear Responsibility, Inc. v. Seaborg,* 149 U.S.App.D.C. 393, 463 F.2d 796, 799 (1971); *People of Enewetak v. Laird,* 353 F.Supp. 811 (D.Hawaii 1973). The Navy, just like any federal agency, must carry out its NEPA mandate "to the fullest extent possible" and this mandate includes weighing the environmental costs of the Trident Program even though the project has serious national security implications.[12]

█ It is important to note that the appellants here do not attack the Navy's Trident decision *on the merits.* Appellants'

---

the Wilderness Society), have similar characteristics. As the organizations have shown the requisite injury in fact to their members and are certainly within the zone of interests protected by NEPA, their right to bring this suit is well-established. *See United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); and *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).

Walter Heller, an individual appellant, owns land in the vicinity of the Bangor Annex and lives there some months out of the year. Appellant Max Starcevich also lives on property

located along the Hood Canal in Kitsap County. As the district court found, "[t]heir interests in the environment of the area surrounding their properties are the kinds of aesthetic, conservational and recreational values recognized in" *Sierra Club* and *SCRAP, supra.*

11. The Navy is joined in this argument and others by intervenor Pacific Legal Foundation which is a non-profit California corporation formed for the purpose of engaging in matters affecting the public interest. *See* Finding of Fact No. 11; J.A. at 698a.

12. *See generally* Note, *The Extraterritorial Scope of NEPA's Environmental Impact Statement Requirement,* 74 Mich.L.Rev. 349, 359 (1975).

Brief at 79. The appellants focus their attack instead on the inadequacies in the decisionmaking process which gave rise to the Trident dedicated base at Bangor, Washington. The court's role then is to insure that the Navy has taken a "hard look" at the environmental consequences flowing from its substantive decision. *Kleppe v. Sierra Club,* 427 U.S. 390, 410–411, 96 S.Ct. 2718, 2731, 49 L.Ed.2d 576 (1976) at n.21. With this goal in mind, we turn to the arguments raised by the appellants.

### III

■ ■The appellants contend that the Navy acted arbitrarily in adopting the dedicated site concept for the Trident Program and in failing to supply a "program" EIS on Trident. The assumption that Trident would operate out of a single land-based site was already established by 1970 when NEPA went into effect. The Navy therefore argues that NEPA does not apply to this decision. Whether NEPA applies retroactively is not an issue which we must decide here in view of the mandates set forth in the Department of Defense and Navy's own regulations. In the first of a series of Navy instructions implementing NEPA's provisions, "OPNAVINST I" provided in December of 1970 that:

a. At the inception of a major action, including preparation of recommendations or reports on proposals for legislation, the probable ecological and environmental impacts of that action shall be assessed.

b. In the continuation of an *existing* program, the environmental impact of the *proposed continuing action* shall be similarly assessed.

Appellants' Brief at Statutory-Regulatory Addendum, 9a (emphasis added). This instruction was given at the direction of the Deputy Secretary of Defense who had issued "Interim Guidelines on Environmental Statements" on August 8, 1970:

e. *Projects or Programs Initiated Before January 1, 1970.*—Consistent with the above guidelines, an environmental statement shall be filed on actions significantly adversely affecting the quality of the environment even though the actions arise from projects or programs initiated prior to enactment of the NEPA on January 1, 1970 . . . .[13]

By issuing such directions the Department of Defense-Navy bound itself to comply with the substance of the Act. *Vitarelli v. Seaton,* 359 U.S. 535, 539–40, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Rodway v. United States Department of Agriculture,* 168 U.S.App.D.C. 387, 514 F.2d 809, 814 (1975).

■ As a first step in the development of Trident, the Navy studied various methods of supporting the system. The first study, the Strat-X Report, evaluated numerous means of support from the tactical and technological viewpoints of the military, and concluded that a dedicated base was the best way to achieve the primary goal of survivability. When this conclusion was again reviewed in 1972, it was reaffirmed.[14] The district court made a finding of fact, not clearly erroneous in our view, that "[a] dedicated site is *essential* for the achievement of the objectives of the Trident System including the main objectives [*sic*] of survivability." Finding of Fact No. 38; J.A. at 710a–11a (emphasis added). Given the Department of Defense-Navy's primary obligation of providing for the national defense, we cannot say that the Navy officials here made an arbitrary determination when they decided to go forward with the Trident dedicated base after extensive strategic and technical studies highly recommended, if not mandated, this course of action and all the environmental assessments, which were being compiled simultaneously,[15] showed that only minor irreversible or irretrievable impacts would result from their dedicated site decision.[16] *See Environmental Defense Fund v. Corps of*

---

**13.** Department of Defense, "Interim Guidelines on Environmental Statements", 1 Env.L.Rep. 46021 (1971).

**14.** *See* note 3 *supra.*

**15.** The impacts of the Bangor dedicated site decision in general, along with numerous other social and economic impacts, are analyzed in

the preliminary environmental assessments and the Draft and Final EIS's, making a separate Bangor dedicated site EIS, such as appellants seek, redundant and therefore unnecessary.

**16.** For an outline of the irretrievable or irreversible impacts expected to result from the Trident Program, see Final EIS, vol. I at 495–97.

*Engineers*, 470 F.2d 289, 297–300 (8th Cir. 1972); *Calvert Cliffs', supra* at 1113–15.

 Environmental considerations were also given proper weight in that part of the decisionmaking process which was concerned with the selection of a site for the dedicated base. As previously mentioned, the Navy began its selection process by reviewing the physical capabilities of 89 different sites to support the Trident system. In our view, to require the Navy to simultaneously study the environmental impacts of Trident on all of these sites at this stage in its planning would be a wasteful expense of time and money. NEPA is premised on the assumption that all *reasonable* alternatives will be explored by the agency. *Natural Resources Defense Council, Inc. v. Morton, supra* at 837. There is no need however to consider alternatives of speculative feasibility. *Natural Resources Defense Council, Inc. v. Callaway*, 524 F.2d 79, 93 (2d Cir. 1975). The district court found that when the selection process narrowed the choices to 19 sites which satisfied the minimum criteria for a suitable location, the Navy then evaluated in greater detail not only each site's ability to support the weapons system, but also how each site would be affected in environmental terms. Finding of Fact No. 59; J.A. at 719a–20a. The final report recommended 4 candidate sites—St. Mary's, Georgia; Charleston, South Carolina; Cape Kennedy, Florida; and Bangor, Washington. Candidate environmental impact statements were then prepared for each of these nominees.[17] The tentative decision to use Bangor as the support site was made after these candidate assessments were presented to the decisionmakers. Before any irretrievable resources were committed to the Trident Program at Bangor, the Navy undertook another detailed environmental study of this site. It was not until publication of the Final EIS that the *final* decision was made to locate Trident at Bangor, Washington. Finding of Fact No. 109; J.A. at 747a–48a.

The pattern of decisionmaking followed by the Navy in this instance manifestly shows the department's good faith effort to incorporate environmental considerations into each step of the Trident site planning. The environmental costs were properly assessed and weighed against the economic, technical and strategical benefits that each alternative site capable of supporting Trident had to offer. In this way NEPA's purpose was carried out. *See Calvert Cliffs', supra* at 1123.

 Appellants next contend that because a "program" label was attached to Trident, a single comprehensive EIS should have been prepared for the project as this court required in *Sierra Club v. Morton*, 169 U.S.App.D.C. 20, 514 F.2d 856 (1975), *rev'd sub nom. Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976) and *Scientists' Institute for Public Information, Inc. v. AEC*, 156 U.S.App.D.C. 395, 481 F.2d 1079 (1973) ("SIPI"). We note first of all that it would be a highly artificial and superficial rule which would look merely to the label attached to a project, program, etc. for its application. As the Supreme Court has recently stated, it is the cumulative environmental impacts of a plan which require a comprehensive impact statement. *Kleppe v. Sierra Club, supra* at 414, 96 S.Ct. 2732. We must therefore shift our focus from the label to the facts of this case and compare them to those cases where we have required a "program" EIS.

*Sierra Club v. Morton* requires only a short discussion because the Supreme Court decided in its recent review of this case that no comprehensive EIS was needed. *Kleppe v. Sierra Club, supra*. In addition, the issue in *Kleppe* was which whether the petitioners had to prepare one comprehensive impact statement on all proposed projects in a particular region, whereas in the case *sub judice*, the issue of whether there is a broad federal policy involving numerous individual actions at one site whose cumulative effects mandate the preparation of a program EIS.[18] In *Kleppe* the Court looked to see how "interrelated" the various projects were in order to determine if they all had to be included in one EIS. *Kleppe v. Sierra Club, supra* at 411, 96 S.Ct. 2731. Here, the various actions giving rise to Trident are

---

17. The district court found: "As soon as sufficient information was available to identify the sites that appeared to be suitable for the Trident System, preparation of the CEIS was initiated." Finding of Fact No. 64; J.A. at 722a.

18. For an extensive analysis of various cases dealing with the program impact statement problem see Comment, *Planning Level and Program Impact Statements Under the National Environmental Policy Act: A Definitional Approach*, 23 U.C.L.A.L.Rev. 124 (1975).

admittedly "interrelated". We must therefore look to some other authority for guiding light on the resolution of our particular issue.

The other case relied on by appellants, *SIPI, supra,* is more closely analogous to our situation. In *SIPI* the issue was whether an overall program statement need be prepared for the Atomic Energy Commission's liquid metal fast breeder reactor program (LMFBR). The LMFBR Program involved the research, development, and utilization of numerous breeder reactors throughout the country—an entirely new energy technology. This court decided that the broader implications of the LMFBR Program had to be analyzed and that a detailed statement for each new facility would not be sufficient.

 We believe that the case at bar can be distinguished from both the facts and rationale found in *SIPI*. Firstly, the Trident Program does not involve the implementation of any brand new technology with the possibility of unforeseen or unknown consequences. As described above, the Trident Program is simply a further development of the present Polaris/Poseidon system.[19] Secondly, there is no evidence that we have found which suggests that the Trident Program will have any broader implications or impacts than those already cited in the nine volume Draft and

Final EIS's.[20] In fact, the EIS's and their supportive technical studies show that the impacts outside of Kitsap County will be minimal. As far as the policy implications of Trident are concerned, we are aware of no change in our national defense strategy. In the Navy's view, both the Trident Program and Polaris/Poseidon system are central to our nuclear deterrence tactics. There evidently being no shift in our defense policy, we are hard pressed to discover what new implications a "program" EIS would analyze. Finally, there is no indication at present that if the Trident Program at Bangor is found satisfactory, a decision to use Trident on a broad scale (comparable to the LMFBR Program possibilities) might be made. *See SIPI, supra* at 1091. Numerous sites were examined for Trident and only four were found to be capable of supporting the system. As only one of the four was located on the Pacific, the advantageous location from the strategic viewpoint,[21] it seems probable at this time that Trident at Bangor will be the first and the last of these bases. For these reasons, the Navy did not act arbitrarily or irrationally in deciding not to prepare a separate "program" EIS.[22]

## IV

Appellants submit that the Final EIS fails to comply with section 102(2)(C) of NEPA [23] in that it: does not adequately

---

**19.** *See* note 4 *supra.*

**20.** The district court found that the Environmental Protection Agency reviewed the Final EIS and saw no reason to object to the proposed plan. Finding of Fact No. 113; J.A. at 749a.

**21.** Finding of Fact No. 74; J.A. at 728a–29a.

**22.** The appellants also contend that an EIS on the alleged decision to accelerate the Trident Program should have been prepared. As the appellants concede in their brief, 1978 was "the first time there was a definite Initial Operating Capability ("IOC") date." Appellants' Brief at 63. Since the time that 1978 was selected, the firm date for the operation of Trident has been *set back* to 1981 and 1983. *See* note 5 *supra.* There being no evidence that the firm date for the initial operation of the project was in fact accelerated, there remains no question of whether an EIS need be prepared on this aspect. Similarly, the appellants' argument that formal EIS's were not submitted along with congressional appropriation requests for 1972–

74 carries little weight in view of the facts that environmental assessments were continually being prepared during those years and hence, were always available to the legislators and the public, and the Final EIS was submitted en masse to Congress. *See* note 6 *supra.* In this way the environmental source material needed by Congress to make relevant decisions was always at hand. *See Natural Resources Defense Council, Inc. v. Morton,* 148 U.S.App.D.C. 5, 458 F.2d 827, 833 (1972).

**23.** Section 102(2)(C) provides:
(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
(i) the environmental impact of the proposed action,
(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
(iii) alternatives to the proposed action,
(iv) the relationship between local short-term uses of man's environment and the

analyze and describe alternatives to the Bangor dedicated site; fails to adequately assess the environmental impacts outside of Kitsap County; fails to discuss the impacts of the possible deployment of more than ten submarines and the early termination of the Trident Program; does not adequately analyze the fiscal impacts of the Program; and finally, is short-sighted in assessing the environmental impacts only up to 1981.

In determining whether the Navy has complied with section 102(2)(C), we are governed by the rule of reason. *Carolina Environmental Study Group v. United States,* 166 U.S.App.D.C. 416, 510 F.2d 796, 798 (1975); *Sierra Club v. Morton,* 510 F.2d 813, 819 (5th Cir. 1975); *Natural Resources Defense Council, Inc. v. Morton, supra* at 834. In essence then, "[t]he court's task is to determine whether the EIS was compiled with objective good faith and whether the resulting statement would permit a decisionmaker to fully consider and balance the environmental factors." *Carolina Environmental Study Group v. United States, supra* at 819. *See also Calvert Cliffs', supra* at 1115.

This standard of review is particularly important when we look at the alternatives to the dedicated site which were examined in the Final EIS. The discussion of alternative systems in the Final EIS spans three pages in the first volume. Final EIS, vol. I at 35–37. The Navy specifically mentions three alternatives which it investigated:

a. The utilization of the existing support system for the Polaris/Poseidon fleet.

b. Construction of a new support system similar to the Polaris/Poseidon System.

c. The use of existing shipyards for refit of the TRIDENT submarine.

*Id.* at 36. In addition it asserts that "many combinations and configurations" of these approaches, and others, were analyzed. *Id.* at 37. Some alternatives were summarily rejected due to the size of the Trident submarine and missile, but the majority of alternatives apparently were rejected on the basis of the following rationale:

> The conclusion reached was that the most feasible, practical and economical way to achieve the goals of the TRIDENT system was to provide a dedicated shore-based Support Site. The alternative to this, the no build option, was found to be more costly while still requiring extensive construction.

*Id.* at 37.

As we have stated previously, "it is the essence and thrust of NEPA that the pertinent Statement serve to gather in one place a discussion of the relative environmental impact of alternatives." *Natural Resources Defense Council, Inc. v. Morton, supra* at 834. Although we do not require that the Navy portray subjective impartiality in its explication of the merits of various alternatives and their impacts,[24] it is obvious here that the Navy has failed to so much as even mention the environmental aspects of alternatives so that the Final EIS is not as informative in this respect as it should be. *See Calvert Cliffs', supra* at 1114. Thus those concerned with the consequences of the decision are not given any notice of the relative environmental effects of feasible alternatives. *Iowa Citizens for Environmental Quality, Inc. v. Volpe,* 487 F.2d 849, 852–53 (8th Cir. 1973); *Natural Resources Defense Council, Inc. v. Morton, supra* at 837. For us to construe the Navy's language as somehow meaning that the environmental impacts of the alternatives investigated were minimal or less than those caused by a dedicated site, would violate our responsibility to see that the dedicated site decision was arrived at only after reasonable alternatives and their impacts were properly set forth in the Final EIS.[25] *Calvert Cliffs', supra* at 1115; *SIPI, supra* at 1091–92 ("NEPA is not a paper tiger . . . ."). The Navy must therefore expand the "Project Alternatives" section of the Final EIS in order to reasonably conform in good faith with the requirements of section 102 of NEPA.

maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

**24.** *Sierra Club v. Callaway,* 499 F.2d 982, 994 (5th Cir. 1974); *Environmental Defense Fund v. U. S. Army Corps of Engineers,* 470 F.2d 289, 296 (8th Cir. 1972).

**25.** As noted in *Natural Resources Defense Council, Inc. v. Morton:*

. . . The subject of environmental impact is too important to relegate either to implication or to subsequent justification by counsel. The Statement must set forth the material contemplated by Congress in form suitable for the enlightenment of the others concerned.

*Natural Resources Defense Council, Inc. v. Morton, supra* at 836.

■ In the Final EIS the analysis of many areas of environmental impact is often limited geographically to the Trident Support Site and Kitsap County.[26] Appellants urge that this delimitation makes the Final EIS inadequate because there are many possible environmental effects outside of the Kitsap area which should have been addressed. In testing the adequacy of the Final EIS in this regard, we note that the Navy is not required to discuss remote and highly speculative consequences of the Trident Program. *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283 (9th Cir. 1974).

■ The social impact section of the Final EIS sets forth the characteristics of both Kitsap County, the primary impact area, and a brief overview of selected social characteristics in the secondary impact area of Mason, Jefferson, Pierce, King, and Snohomish Counties. Final EIS, vol. I at 56–57, 91–93. The study asserts that the impacts will be concentrated in Kitsap County due to geographic and historic factors—"the county is a peninsula and has limited direct contact with other areas, and most employees of local Navy installations have in the past resided within the county." *Id.* at 56. Appellants do not contend that the social impact analysis for Kitsap County is defective. They merely assert that the possible impacts on the surrounding areas should have been discussed in the same detail. We find that the Navy need not analyze de minimis or remote social impacts to the same extent as it has successfully analyzed the major social environmental aspects of Trident. *See generally Life of the Land v. Brinegar*, 485 F.2d 460, 469–70 (9th Cir. 1973); *Natural Resources Defense Council, Inc. v. TVA*, 367 F.Supp. 128, 132 (E.D.Tenn. 1973), *aff'd*, 502 F.2d 852 (6th Cir. 1974). The discussion of the social impacts was reasonable, adequate, and served the purpose of the EIS: to aid the decision-maker in arriving at a reasoned choice. *Calvert Cliffs', supra* at 1114.

■ The economic impact analysis is divided, like the social impact section, into primary and secondary impact areas. The analysis of the economic impacts on the secondary areas is also truncated due to the

physical isolation of Kitsap County and the resultant "self-contained economy". Final EIS, vol. I at 132. As an example of how the geographic isolation of Kitsap affects its working population, the Final EIS states that in 1974, when the statement was prepared, 2.4 percent of the Bangor Annex civilian employees lived in neighboring Jefferson County and only .7 percent lived in Mason County. *Id.* at 209. There being no reason to believe that the residential pattern would disproportionately change because of Trident, the economic impact section's focus on the primary impact area of Kitsap County was entirely proper.

Each of the other impact sections dwells in depth on the areas where the most significant environmental impacts will be felt. In the main, this means that only impacts in Kitsap County, or parts thereof, are set forth in abundant detail. The definitions of the various regions subject to detailed analyses were based on considerations of regional topography, current and future population distribution, and traffic patterns. *See, e.g.,* Final EIS, vol. I at 247. This limiting of the scope of the analysis was reasonable as only significant environmental impacts could affect the outcome of the Trident decision. The Final EIS therefore is not inadequate for failing to fully assess all the possible environmental impacts of the Trident Program outside of Kitsap County.

■ The appellants' next argument is that the Final EIS fails to discuss the impacts of the possible deployment of more than ten submarines and the early termination of the Trident Program. The early technical studies adverted to a twenty ship fleet but this plan was not analyzed in the Final EIS. Apparently there are no foreseeable plans or Congressional appropriations for increasing the fleet contingent at this time; nor have the appellants shown any likelihood that Trident will be expanded in the future rather than developed further as the Polaris/Poseidon system was developed here. Should the Navy decide to add additional submarines to Trident, it acknowledges that such an action would require an additional environmental assessment. Final EIS, vol. II at 5–6. As the

---

26. For example, the discussion of the impacts on transportation, visual quality, water, flora, fauna, and utilities is limited to Kitsap County. The analysis of the impacts on historic and archeological values, air quality, and noise is delimited to only parts of Kitsap County. The

major portions of the Final EIS, those dealing with the social and economic impacts of Trident, explore the impacts in Kitsap County as well as referring in a general way to the impacts on other surrounding counties. Final EIS, vol. I *passim.*

Navy is not required by NEPA to "foresee the unforeseeable", no impact statement covering the deployment of twenty ships is needed at this point. *Union of Concerned Scientists v. AEC,* 163 U.S.App.D.C. 64, 499 F.2d 1069, 1084 (1974); *SIPI, supra* at 1092.

 Similarly, the appellants raise the remote possibility that Trident might face early termination and therefore this aspect of the Program should have been analyzed in the Final EIS. However the appellants fail to cite any evidence whatsoever to show that there is any likelihood of early termination occurring here. As far as the Navy is concerned, Trident is "a permanent naval installation and as such has no foreseeable close down date." Final EIS, vol. II at 4–5. NEPA does not mandate that every conceivable possibility which someone might dream up must be explored in an EIS. *See Carolina Environmental Study Group v. United States, supra* at 801.

Appellants also allege that the Final EIS is deficient in its consideration of the fiscal impacts of Trident. They express particular concern about the discussion relating to local taxes and real estate values. Many of the public comments which the Navy received in response to its Draft EIS also mentioned these two subjects. *See, e.g.,* Testimony of Mr. Gene Lobe, Final EIS, vol. II at 36–43, April 24 and 25, 1974.

 The Final EIS recognizes that "[a] central issue confronting Kitsap County with respect to the TRIDENT project, is whether or not the TRIDENT-related population will contribute enough in the way of revenues to cover the costs of providing the public services they require." Final EIS, vol. I at 194. It then goes on to analyze in detail each of the major categories of public service—water and sewer, general services and education—in terms of their cost requirements and sources of revenue.[27] Where Trident would impose an additional tax burden upon the local population, it is so noted. *See, e.g.,* Final EIS, vol. I at 195,

201. In addition, the Navy specifically responded to the public's expressed concern over property taxes in volume II of the Final EIS.[28] This extended discussion of fiscal impacts is adequate under section 102 of NEPA. It allows local communities to develop specific plans to deal with these economic problems. This is proper as the EIS was not intended to be a substitute community planning device. The Navy acknowledges that it must ameliorate Trident's impacts when possible[29] but those impacts still remaining and fully disclosed in the EIS must be analyzed and dealt with by local planning officials.

 The last bone of contention among the parties here is how far into the future should the Navy carry the time frame of its EIS for Trident. According to section 102(2)(C)(iv) of NEPA, the Final EIS must consider

> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity . . . .

42 U.S.C. § 4332 (1970). In addition, the Navy is charged under NEPA with the duty of carrying out the national policy of "fulfill[ing] the responsibilities of each generation as trustee of the environment for succeeding generations". 42 U.S.C. § 4331(b)(1) (1970).

In light of these mandates, we must consider whether 1981 was a reasonable date to end the forecasting of Trident's environmental impacts.[30] The Navy makes no assertion that it is unable to predict the impacts after 1981. *See* Appellees' Brief at 15. It merely views 1981 as a reasonable date to stop studying the impacts because that was the target date for the initial operation of Trident.[31] We cannot agree with the Navy and the district court in the conclusion that because Trident will begin operating in 1981, and most of the civilian and military employees will be on the job at the Bangor base by that time, that almost

---

**27.** This analysis is set forth in full for both options of off-site military housing and on-site military housing. Final EIS, vol. I at 194–207.

**28.** Final EIS, vol. II at 63–64.

**29.** *See Calvert Cliffs' Coordinating Committee, Inc. v. AEC,* 146 U.S.App.D.C. 33, 449 F.2d 1109, 1118 (1971).

Each section of the Final EIS contains a subsection on "Ameliorative Measures" which sets forth the steps which either have been taken,

will be taken, or should be taken to blunt the impact of the Trident Program. Final EIS, vol. I at 127–30, 209–11, 226–28, 240–42, 269–70, 289–96, 314–17, 345–50, 371–73, and 407–08.

**30.** A few of the environmental studies extended through 1983, but in the main, the studies reflected impacts only up to 1981. J.A. at 794a; Appellees' Brief at 14.

**31.** *See, e.g.,* Final EIS, vol. I at 248, 361.

all significant effects will have occurred by 1981. J.A. at 794a–95a. After the base is operating at full capacity for a few years and the population stabilizes, the environmental impacts may differ from those cited in studies which analyzed the impacts during the construction phase of the base, a time when Bangor was experiencing the initial influx of new workers—some temporary and some permanent. Just as the EIS for a proposed highway may not analyze only the environmental effects of the construction stage of the new road, but must also look to the noise, pollution, etc. which it will bring to the community when it is completed,[32] so too must the Final EIS here examine the impacts generated by the Trident base once it is in operation. Furthermore, absent an agency's inability to predict any farther into the future, a forecasting of only 7 years of the impacts from such a major facility as the Trident Support Site, fails to ensure that the environment will be preserved and enhanced for the present generation, much less for our descendants.

Although we do not demand that the agency "foresee the unforeseeable", make "crystal ball" inquiries or prophecies instead of predictions,[33] we do find that the Navy here was too short-sighted in setting forth the environmental impacts of the Trident Program. It need not, and indeed, may not be able to forecast the effects of Trident after 1981 in the same detail or with the same degree of accuracy as it has done for the period prior to 1981, but it is imperative that it make a reasonable effort to discern what the effects of Trident's future operation will be. See SIPI, supra at 1092. Thus, we must remand on this point to allow for further Navy analysis.

V

As the Navy has taken no arbitrary or capricious action here but has attempted to comply in good faith with the mandates of NEPA, failing in only two instances, we do not believe that the issuance of an injunction pending the Navy's revision of the Final EIS is necessary, especially since we have found that the Navy gave proper weight to environmental considerations in deciding to proceed with this strategically important project. See Committee for Nuclear Responsibility, Inc. v. Seaborg, supra at 795.

The work on the Trident Support Site at Bangor, Washington may therefore continue. The case is remanded to the district court to afford the Navy an opportunity to correct the two deficiencies in the Final EIS mentioned previously. It must supplement its Final EIS to include: 1) an analysis of environmental impacts for a reasonable period after 1981; and, 2) a further discussion of the alternative systems and their environmental consequences which the Navy considered before choosing the dedicated site alternative. This revised Final EIS must be submitted to the district court within 120 days of the issuance of this opinion.

So ordered.

LEVENTHAL, Circuit Judge.

I concur in the judgment and generally in Judge TAMM's opinion. The points of difference between us are not crucial. What concerns me more are matters of emphasis and identification of the features of decisions that loom large.

First, I agree with Judge TAMM that the Environmental Impact Statement is defective insofar as it fails to assess the consequences of operating the Bangor site beyond its projected completion in 1981. We are increasingly aware that the cumulative impact of ordinary and probable human activities may be deeper than that of actions deliberately intended to alter the environment. Judge TAMM's opinion correctly identifies the need for a meaningful EIS to examine the long term consequences of operating a project as well as the immediate effect of constructing it.

Second, I have grave doubts about whether the Navy complied with NEPA when making its crucial decision to use a single dedicated site. Appellants point out that the use of existing sites with additional submarines might have involved less damage to the environment, and would not have sacrificed strategic interests. They argue that since the rejection of that alternative was based on considerations of cost rather than military strategy, more timely and

---

32. See generally Swain v. Brinegar, 517 F.2d 766, 775–77 (7th Cir. 1975); Rankin v. Coleman, 394 F.Supp. 647, 655–57 (E.D.N.C. 1975); Appalachian Mountain Club v. Brinegar, 394 F.Supp. 105, 115–17 (D.N.H. 1975).

33. Union of Concerned Scientists v. AEC, 163 U.S.App.D.C. 64, 499 F.2d 1069, 1084 (1974); Scientists' Institute for Public Information, Inc. v. AEC, 156 U.S.App.D.C. 395, 481 F.2d 1079, 1092–93 (1973); Natural Resources Defense Council, Inc. v. Morton, supra at 837.

thorough analysis of environmental considerations might have had a significant impact on the decision.

While I find merit in these contentions, I am not persuaded that relief is appropriate in the circumstances of this case. The initial recommendation to use a dedicated site was made in 1968. NEPA became effective *in medias res*, so that the question for military planners was whether to overhaul a strategic decision because of environmental factors. The Navy's solution was to defer the environmental assessment to the future, to the time when the particular site would be selected. That approach is not sound, since it fails to deal with the possibility that environmental considerations that were not overwhelming enough to affect the result when considered at a later time might have tipped the scales if timely considered. Yet pragmatically this permitted environmental factors to affect the project if they were sufficiently weighty. That NEPA had less impact on projects already in process, as it were, is probably undeniable as a psychological matter, and has at least some undercurrent of legal validity.[1] The question is one of degree, balance and judgment.

■■■ In an overall assessment of the consequence of a less than adequate NEPA process for a project already in process by 1969, it is not irrelevant that in this case further delay might injure our nation's defense posture. While the situation here is not as urgent as that which led to a prudential withdrawal by the courts on the eve of the Amchitka detonation, *see Committee For Nuclear Responsibility v. Schlesinger*, 404 U.S. 917, 92 S.Ct. 242, 30 L.Ed.2d 191 (1971), the possibility of some damage to strategic interests brings this case out of a category like river and harbor projects of the Corps of Engineers. And although the Navy's assessment of environmental factors was insufficient, and even vexing, its approach did not constitute the kind of gross violation of NEPA[2] which would override even strong strategic considerations.

All in all, I see pragmatic wisdom and sound discretion in the court's decision to permit construction to go forward but to require that environmental consequences be reexamined. This does not contemplate a charade. The Defense Department is obligated to undertake a NEPA analysis in good faith. And this means more than taking the prior statement as incorporating a "given" result in regard to consequences of construction, with attention narrowly focused on the incremental environmental consequences of operation. It requires a fresh look at the balance—weighing the overall consequences to the environment (construction plus operation) against the benefits of the project, and weighing the alternatives with the same overall balance.

It may not be likely that the Defense Department will in the end decide to scrap the Bangor project. But NEPA has been a contributing factor to other governmental decisions to abort projects on which substantial energies and resources had been expended—as in the case of the Trans-Florida canal, or to modify a project even when the central concept is not found to violate the statutory standard—as in the case of the Alaska Pipeline.[3] So it may be here that a fair look at overall environmental aspects will accompany a rethink of strategic concepts. It may be, for example, that the Defense Department will conclude that the Bangor project should go forward, but not with the same scope or features,[4] and that it can be coordinated with other sites and facilities in a better balance of strategic and environmental considerations. In any event, *our decision holds this door open.*

I am authorized to say that Judge KAUFMAN joins in this opinion.

---

1. *See Environmental Defense Fund v. Corps of Engineers*, 470 F.2d 289, 295–96 (8th Cir. 1972), *cert. denied*, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973). *See also Maryland-National Cap. Park & Planning Com'n v. U. S. Postal Service*, 159 U.S.App.D.C. 158, 171, 487 F.2d 1029, 1042 (1973).

2. I do not accord the Navy's conduct the homage of "good faith," for that usually involves objective reasonableness. The record gives at least some support to appellant's contention that even after NEPA became effective, the Defense Department was engaging in reevaluation of the strategic concept without considering any environmental consequences, and was, in fact, using its environmental planning activities only as a smokescreen.

3. Leventhal, *Environmental Decisionmaking and the Role of the Courts*, 122 U.Pa.L.Rev. 509, 527 (1974).

4. Cf. *Maryland-National Cap. Park & Planning Com'n, v. U. S. Postal Service*, 159 U.S.App. D.C. 158, 171–72, 487 F.2d 1029, 1042–43 (1973) (denial of injunctive relief may be conjoined with conditions protective of the environment).