NO GWEN ALLIANCE OF LANE COUNTY, INCORPORATED, an Oregon non-profit corporation; Lane County, Oregon, a public body of the State of Oregon; No GWEN Alliance of Butte County, California; the GWEN Project, Plaintiffs–Appellants,

v.

Edward C. ALDRIDGE, Jr., Secretary of the Air Force, U.S. Department of the Air Force, and all employees over whom he exercises authority, Defendants–Appellees.

No. 86–4082.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 4, 1987.

Decided March 9, 1988.

As Amended on Denial of Rehearing Aug. 30, 1988.

Before WALLACE, FLETCHER and BRUNETTI, Circuit Judges.

BRUNETTI, Circuit Judge:

## I

### Overview

This controversy centers around the Air Force's attempt to install numerous 300 foot radio towers that will become components in the Ground Wave Emergency Network (GWEN). The No GWEN Alliance (No GWEN) complained that the Air Force's Environmental Assessments (EA) for the project are inadequate because they fail to discuss environmental impacts of GWEN, including the impact of a nuclear exchange which might be provoked, at least in part, by the installation or use of the GWEN system.

GWEN's purpose is to send war messages to United States strategic forces during and after a nuclear war. It utilizes low frequency radio waves between sensor installations, command posts, and land based nuclear forces. It is designed to withstand the electromagnetic pulse generated by atmospheric nuclear detonations.

The Air Force issued a generic environmental assessment for the entire project and site specific environmental assessments for each proposed tower location. Additionally, the Air Force issued a finding of no significant impact (FONSI) for the Eugene, Oregon and Chico, California sites. These documents all concluded that no environmental impact statement for the project is required.

No GWEN contends that these documents should consider the environmental impact of nuclear war and that these impacts should be described in an environmental impact statement. The Alliance presented opinion evidence that the GWEN system is destabilizing and would make nuclear war more probable, that it will make prolonged nuclear war more likely, and that it makes more likely the danger that any nuclear conflagration would become uncontrollable. Furthermore, No GWEN's witnesses testified that any geo-

Ralph A. Bradley, and Bradley & Gordon, Eugene, Or., for plaintiffs-appellants.

J. Carol Williams, Dept. of Justice, Col. Richard Lotz (appearance only), U.S. Air Force, Washington, D.C., Thomas C. Lee, Asst. U.S. Atty., Portland, Or., for the defendants-appellees.

graphic area in which a GWEN tower is located would become a priority target.

In the environmental assessments, the Air Force provided one major policy reason for deployment of GWEN: the system will act as a deterrent to nuclear war because our adversaries know that GWEN will withstand a first nuclear strike and will be used to launch American nuclear weapons in retaliation. No GWEN filed suit in district court to enjoin the Air Force from proceeding with the GWEN project without discussing the probable environmental impacts in case its experts are correct that GWEN will cause a nuclear exchange.

The District Court denied No GWEN's motion for a temporary restraining order. Before the show cause hearing for the preliminary injunction, both the Air Force and No GWEN moved for summary judgment. No GWEN appeals from the judgment denying the preliminary injunction and granting summary judgment in favor of the Air Force. The court ruled that, insofar as the case called on the court to determine the effect of GWEN on the probability of nuclear war, it involved only non-justiciable political questions. Alternatively, the court held that injunctive relief was not available because there was no probability that the plaintiff would prevail on the merits. It also held that the Air Force had complied with NEPA so far as compliance with local land use planning and non-nuclear effects of physical construction of the project were concerned.

## II

### Standard of Review

■ A district court's denial of injunctive relief will be reversed only where the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact. *Colorado River Indian Tribes v. Town of Parker*, 776 F.2d 846, 849 (9th Cir.1985); *Bank of America National Trust & Savings Association v. Summerland County Water District*, 767 F.2d 544, 547–48 (9th Cir.1985). In this appeal, No GWEN contends that the district court based its decision to deny injunctive relief on an erroneous legal standard.

The grant of summary judgment in favor of the Air Force is reviewed de novo. *Darring v. Kincheloe*, 783 F.2d 874, 876 (9th Cir.1986). We must determine whether there is any issue of material fact and whether the district court correctly applied the relevant substantive law. *Id.* See *Ashton v. Cory*, 780 F.2d 816, 818 (9th Cir.1986) (where facts are in dispute, appellate court must view evidence in light most favorable to movant and determine whether there are genuine issues of material fact that should be tried).

## III

### Justiciability

"The concepts of standing and political question are separate aspects of justiciability, and either the absence of standing or the presence of a political question precludes a federal court, under article III of the Constitution, from hearing or deciding the case presented." *American Jewish Congress v. Vance*, 575 F.2d 939, 943 (D.C. Cir.1978). When both standing and political question issues are before the court, the court should determine the question of standing first. *Id.*

### A. *Standing*

■ The Air Force cites *Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972), for the proposition that "a mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself" to confer standing. But because this holding is limited to cases in which the plaintiff relies upon the Administrative Procedure Act section 10, 5 U.S.C. § 702, to establish subject matter jurisdiction, it does not control the present case. In *Sierra Club*, the Court also stated the appropriate standing requirements for cases brought under the general federal question jurisdiction statute, 28 U.S.C. § 1331:

Where the party does not rely on any specific statute authorizing invocation of the judicial process, the question of

standing depends upon whether the party has alleged such a "personal stake in the outcome of the controversy," *Baker v. Carr*, 369 U.S. 186, 204 [82 S.Ct. 691, 703, 7 L.Ed.2d 663], as to ensure that "the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." *Flast v. Cohen*, 392 U.S. 83, 101 [88 S.Ct. 1942, 1953, 20 L.Ed.2d 947]. *Sierra Club*, 405 U.S. at 732 [92 S.Ct. at 1364]. *See also LaDuke v. Nelson*, 762 F.2d 1318, 1323 (9th Cir.1985) (plaintiff must personally suffer some actual or threatened injury that can be "fairly" traced to defendant's challenged conduct).

■ Because No GWEN Alliance has alleged no injury to itself as an organization, it can establish standing in this suit "only as [the] representative[ ] of those of [its] members who have been injured in fact, and thus could have brought suit in their own right." *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 40, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976). The Air Force contends that the allegations of injury to No GWEN's members are too vague to confer standing under *Sierra Club*. In *Sierra Club*, the plaintiff claimed standing to maintain its "public interest" lawsuit because it had "a special interest in the conservation and the sound maintenance of the national parks, game refuges and forests of the country...." 405 U.S. at 730, 92 S.Ct. at 1364. No GWEN alleged more in its complaint:

> Plaintiff has members that traverse the entire United States wherein GWEN towers are scheduled to be built. Members use these areas throughout the United States for recreation including hiking, bird watching, and fishing. Many members live in areas that would be environmentally affected in the event the GWEN system was put to use.

It is precisely this type of allegation that the Supreme Court found sufficient to establish standing in an environmental case in *United States v. Scrap*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). In *Scrap*, the plaintiffs alleged that "their members used the forests, streams, moun-

tains, and other resources in the Washington metropolitan area for camping, hiking, fishing, and sightseeing, and that this use was disturbed by the adverse environmental impact caused" by the defendants' conduct. *Id.* at 685, 93 S.Ct. at 2415. The Court distinguished *Sierra Club* because:

> '[t]he Sierra Club failed to allege that it or its members would be affected in any of their activities or pastimes by the ... development.' *Ibid.* Here, by contrast, the appellees claimed that the specific and allegedly illegal action of the Commission would directly harm them in their use of the natural resources of the Washington Metropolitan Area.

*Id.* at 687, 93 S.Ct. at 2416.

The Air Force also contends that standing should be denied the No GWEN Alliance because many people other than the plaintiffs would suffer the same injury. The Supreme Court has rejected that argument, *Scrap*, 412 U.S. at 687, 93 S.Ct. at 2415, and so must we.

No GWEN Alliance, because of the specific allegations of harm to its members, has standing to bring this action. We turn now to the question of whether No GWEN's suit raises only political questions.

### B. *Political Question*

The Air Force contends that No GWEN's suit to compel a discussion of the environmental impact of nuclear war raises only nonjusticiable political questions. The District Court Judge agreed, stating "I cannot conceptually divorce the political question of whether GWEN will increase the chance of nuclear war from a purely procedural question of whether there are substantial questions as to whether GWEN will increase the chance of nuclear war."

The Supreme Court has indicated that an issue is a nonjusticiable political question when one of the following circumstances is present:

> "a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable stan-

dards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

*INS v. Chadha*, 462 U.S. 919, 941, 103 S.Ct. 2764, 2779, 77 L.Ed.2d 317 (quoting *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962)). Of these factors, the parties in this case focus on the presence or absence of "judicially discoverable and manageable standards" for resolving this conflict.

This court has no "judicially discoverable and manageable standards" to review the merits of national defense policy, including the Air Force's decision to deploy GWEN. But the appellants are not seeking a review of the merits of this decision. Rather the appellants simply want to insure that the Air Force complies with the National Environmental Protection Act (NEPA), 42 U.S.C. § 4321 et seq., by considering all of the environmental effects of constructing GWEN. They contend that nuclear war should be discussed since there are substantial questions as to whether deployment of GWEN could reasonably result in a nuclear war.

A unanimous Supreme Court has stated the goals of NEPA thus:

We have previously noted: 'The thrust of 102(2)(C) is ... that environmental concerns be integrated into the very process of agency decisionmaking. The "detailed statement" it requires is the outward sign that environmental values and consequences have been considered during the planning stage of agency actions.' *Andrus v. Sierra Club*, 442 U.S. 347, 350 [99 S.Ct. 2335, 2337, 60 L.Ed.2d 943] (1979). Section 102(2)(C) thus serves twin aims. The first is to inject environmental considerations into the federal

agency's decisionmaking process by requiring the agency to prepare an EIS. The second aim is to inform the public that the agency has considered environmental concerns in its decisionmaking process.

*Weinberger v. Catholic Action of Hawaii*, 454 U.S. 139, 143, 102 S.Ct. 197, 201, 70 L.Ed.2d 298 (1981). In *Catholic Action* the Court held that the Navy must consider environmental effects of constructing a nuclear weapons dump in Hawaii, but need not publish those portions of an environmental impact statement which would jeopardize national secrets. The opinion does not discuss the political question doctrine, but states that the Court of Appeals should have accepted the balance struck by Congress, balancing the needs of the public for access to federal documents and the necessity for secrecy, rather than engrafting onto statutory language "unique concepts of its own making". *Id.* at 145, 102 S.Ct. at 202. The Court used "judicially discoverable and manageable standards" for resolving the merits of the case.

█ There is no "national defense" exception to NEPA. By reaching the merits of *Catholic Action*, the Supreme Court impliedly rejected that argument. The D.C. Circuit did so explicitly in *Concerned About Trident v. Rumsfeld*, 555 F.2d 817 (1977). "The Navy, just like any federal agency, must carry out its NEPA mandate 'to the fullest extent possible' and this mandate includes weighing the environmental costs of the Trident Program even though the project has serious national security implications." *Id.* at 823. As in this case, the appellants in *Trident* did not attack the Navy's Trident decision on the merits. Rather, they focused their NEPA attack "on the inadequacies in the decisionmaking process which gave rise to the Trident dedicated base at Bangor, Washington." 555 F.2d at 824.

█ We conclude that a lawsuit challenging development of a defense installation on the grounds that the responsible agency did not discuss environmental impacts causally related to the installation raises justiciable questions. The district

court impliedly agreed in that it specifically considered and ruled on the Air Force's compliance with NEPA, insofar as physical construction of the GWEN towers and compliance with land use regulations were concerned. We turn now to the question of whether NEPA requires a discussion of the impact of nuclear war that could result because of deployment of GWEN. Our role in this case is not to consider the propriety of constructing GWEN, but rather to insure that the Air Force in exercising its discretion to develop GWEN has taken a "hard look" at the environmental consequences flowing from its substantive decision. *See Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976).

## IV

## Nexus between GWEN Installation and Environmental Impact of Nuclear War

■ The district court cited *Metropolitan Edison Co. v. People Against Nuclear Energy,* 460 U.S. 766, 103 S.Ct. 1556, 75 L.Ed.2d 534 (1983) in support of its holding that NEPA does not require discussion of environmental impacts not causally related to the agency action and that the possibility of GWEN causing nuclear war is remote. That case does not control this one because it discusses a different type of causation than that at issue in this case.

The plaintiffs in *Metropolitan Edison* challenged the resumed operation of one of the nuclear power plants at Three Mile Island ("TMI") after a second plant malfunctioned, causing widespread concern but no dangerous release of radiation. They contended that NEPA required that the Nuclear Regulatory Commission consider the threat to the psychological health of nearby residents in an environmental impact statement (EIS) before permitting the TMI operators to restart the undamaged reactor, and that psychological health damage will flow directly from the risk of a nuclear accident. The Court rejected the plaintiffs' contention, stressing that NEPA was not a vehicle for airing general policy objections to federal action, but rather addressed only protection of human health by protecting the physical environment, and that psychological health damage from an unrealized risk of an accident is not an effect on the physical environment cognizable under NEPA. *Id.* at 772–74, 776–77, 103 S.Ct. at 1560–61, 1562–63. The Court noted that the NEPA legislative history showed a primary concern for potential irreparable damage to the physical resources that support life—air, land, and water— suggesting that NEPA was designed to require only agency consideration of harms following closely from changes in the physical environment. *Id.* at 772–74, 103 S.Ct. at 1560–61. The Court thus rejected the argument that an EIS should discuss the potential impact of "fear" of a nuclear accident on the area's residents, and held that since "fear" is not an impact on the *physical* environment, there is a link missing in the causal chain that placed that case beyond the reach of NEPA. *Id.* at 775, 103 S.Ct. at 1561. This case requires us to examine the relationship between the agency action and a potential impact on the environment. This link in the chain of causation is the subject of several Ninth Circuit decisions.

Appellants correctly point out that Ninth Circuit authorities require an EIS not only when the challenged agency action *will in fact cause* significant effects on the human environment, but also when the action *may* have a significant effects on the human environment. *Foundation for North American Wild Sheep v. U.S. Dept. of Agriculture,* 681 F.2d 1172, 1178 (9th Cir. 1982); *City of Davis v. Coleman,* 521 F.2d 661, 673 (9th Cir.1975). But this court has also rejected the notion that every conceivable environmental impact must be discussed in an EIS. In *Warm Springs Dam Task Force v. Gribble,* 621 F.2d 1017 (9th Cir.1980), this court concluded that the environmental impact of a dam failure caused by a catastrophic earthquake need not be discussed in the Army Corps of Engineers' EIS:

[A]n impact statement need not discuss remote and highly speculative consequences. *Trout Unlimited v. Morton,* 509 F.2d 1276, 1283 (9th Cir.1974); *Environmental Defense Fund, Inc. v. Hoff-*

*man,* 566 F.2d 1060, 1067 (8th Cir. 1977).... Everyone recognizes the catastrophic results of the failure of a dam; to detail these results would serve no useful purpose.

*Id.* at 1026–27.

No GWEN admits that its contention that GWEN would increase the probability of nuclear war is merely speculative.[1] Additionally, we find the contention that GWEN would be a primary target in a nuclear war to be equally speculative. Thus, based on our holding in *Warm Springs Dam,* neither proposition must be discussed in an environmental assessment or environmental impact statement.

Nevertheless, appellants contend that their own speculation should be discussed along with the Air Force's speculation that GWEN would deter rather than promote war. We reject this contention. Although both experts and laymen disagree on the precise environmental impact of a nuclear exchange, everyone recognizes that these effects would be catastrophic. Detailing these results would serve no use useful purpose. *Warm Springs Dam,* 621 F.2d at 1026.

*Warm Springs Dam* controls this case. Consequently, we hold that the nexus between construction of GWEN and nuclear war is too attenuated to require discussion of the environmental impacts of nuclear war in an environmental assessment or environmental impact statement.

## V

### Non-nuclear Effects of GWEN

No GWEN contends that the district court completely ignored that portion of its suit which dealt with non-nuclear effects. After reviewing the generic and site-specific environmental assessments, we conclude that the Air Force did, in fact, identify and discuss the non-nuclear impacts that would result from the construction and operation of the GWEN system. The Air Force discussed impacts on earth, water and air quality, biology, health and safety, floodplains and wetlands, cultural resources, and aesthetics. Noise, radio interference, radiation hazards and other effects were also discussed. No GWEN did not challenge the Air Force's discussion of the impacts. Rather, plaintiffs alleged that the Air Force violated NEPA by not discussing how the requirements of 40 C.F.R. § 1508.27(b)(4)(5), and (10) apply to its decision not to prepare an EIS.

NEPA requires that federal agencies prepare an environmental impact statement for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The Council on Environmental Quality (CEQ) regulations interpret the word "significantly" and state that the word as used in NEPA requires considerations of both context and intensity. 40 C.F.R. § 1508.27. Regulations promulgated by the CEQ are binding on federal authorities. *Id. See Jones v. Gordon,* 792 F.2d 821, 827 (9th Cir.1986). In this appeal, the parties focus on the intensity of GWEN's effects, including degree of controversy surrounding the agency action, *see id.* § 1508.27(b)(4), the extent to which possible environmental impacts are uncertain or involve unique or unknown risks, *see id.* § 1508.27(b)(5), and whether the fact that agency action violates some local law are factors to be considered in determining whether an action is "significant" enough to require an EIS. *See id.* § 1508.27(b)(10); *see also Jones,* 792 F.2d at 827. We will consider each of these subsections separately.

### A. *Violations of Local Law*

One factor that must be considered in evaluating the significance of an action for NEPA purposes is "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the

---

**1.** 40 C.F.R. § 1502.22 requires discussion of "reasonably forseeable" impacts. Section 1502.-22(b)(4) provides: "For the purposes of this section, 'reasonably foreseeable' includes impacts which have catastrophic consequences, even if their probability of occurrence is low, *provided that* the analysis of the impacts is supported by credible scientific evidence, *is not based on pure conjecture, and is within the rule of reason.*" (Emphasis added.) The regulation is thus consistent with the holding in this case as well as the analysis in *Warm Springs Dam.*

protection of the environment." 40 C.F.R. § 1508.27(b)(10). No GWEN contends that the GWEN installation planned for Lane County, Oregon would violate local zoning and other land use laws.

■ The briefs filed in this appeal raised the question whether aspects of this case involving only the Lane County installation are moot. Both parties noted that Senator Hatfield announced that his office had reached an accord with the Air Force that a tower would not be built in Lane County, but that there was no written agreement to that effect. The Declaration of Brigadier General Rankine, Jr., filed pursuant to this court's order after the hearing, makes it clear that the Lane County site may be used if the Air Force cannot find a suitable alternate site elsewhere in Oregon. We are therefore unable to conclude that "it can be said with assurance that 'there is no reasonable expectation . . .' that the alleged violation will recur." *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979) (citations omitted). Nor can we conclude that the informal agreement between the Air Force and Senator Hatfield has "completely and irrevocably eradicated the effects of the alleged violation." *Id.* The case is therefore not moot.

■ Nonetheless, No GWEN's contention that the district court ignored the issue of local law violation is somewhat ironic. It is No GWEN that ignored this issue. The district court found that the EA discussed local zoning law and land use. In its Environmental Assessment for the Lane County site, the Air Force considered "the existing land use at the site, existing surrounding land use, future development plans, and land use designation/zoning and determined that the proposed GWEN installations did not constitute a departure from existing land uses." *See* Environmental Assessment, Ground Wave Emergency Network, Relay Node in the Area of Eugene, Oregon, Section 3.7.2 page 28. No GWEN offered no support for its contention that the Air Force's consideration of this issue was inadequate, other than to offer one footnote in its summary judg-

ment opposition that "the court may take judicial notice that the zoning laws [at issue] . . . are intended to protect the environmental integrity of Lane County, Oregon." A party opposing summary judgment "may not rest upon the mere allegations or denials of [its] pleadings" but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). No GWEN failed to demonstrate a genuine disputed issue on the adequacy of the EA's treatment of zoning laws.

**B.** *Controversial, Uncertain, Unique, or Unknown Environmental Impacts*

■ The CEQ regulations provide that "the degree to which the effects on the quality of the human environment are likely to be highly controversial" and "the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks" should be considered in determining whether an action is "significant" for NEPA purposes. 40 C.F.R. § 1508.27(b)(4) and (5).

No GWEN made no showing in its summary judgment opposition that the non-nuclear environmental effects of GWEN implicated the considerations outlined in § 1508.27(b)(4), (5). Thus, the aspects of GWEN at issue here are the nuclear effects discussed above. While the precise effects of a nuclear exchange may be "controversial," "uncertain," "unique," and "unknown," everyone recognizes that these effects would be catastrophic. As discussed *supra*, detailing these results would serve no useful purpose. The NEPA requirement that the agency activity be causally related to an environmental impact is not overcome simply because the exact effect of the project is, for example, controversial or unique.

The judgment of the district court therefore is AFFIRMED.