383 F.3d 1082
 GROUND ZERO CENTER FOR NON-VIOLENT ACTION; Waste Action Project; Washington Physicians for Social Responsibility; Cascadia Wildlands Project; Peace Action of Washington; Mary Fleysteen; Glen Milner, Plaintiffs-Appellants,
v.
UNITED STATES DEPARTMENT OF THE NAVY; Duane Baker, Jr., Captain, Commanding Officer, Naval Submarine Base, Bangor; Bruce A. Gustion, III, Captain, Commanding Officer, Strategic Weapons Facility, Pacific, Naval Submarine Base, Bangor, Defendants-Appellees.
 No. 02-36096.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted June 10, 2004.
 Filed September 21, 2004.
 
 David S. Mann, Gendler & Mann, LLP, Seattle, WA, for the plaintiffs-appellants.
 Kathryn E. Kovacs, U.S. Department of Justice, Environment & Natural Resources Division, Washington, D.C., for the defendants-appellees.
 Appeal from the United States District Court for the Western District of Washington; Franklin D. Burgess, District Judge, Presiding. D.C. No. CV-01-05339-FDB.
 Before BRUNETTI, McKEOWN, and GOULD, Circuit Judges.
 GOULD, Circuit Judge:
 
 
 1
 At issue is a challenge under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., and the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq., to the United States Navy's ("Navy") Trident II missile upgrade program at its submarine base in Bangor, Washington. Appellants Ground Zero Center for Nonviolent Action, Waste Action Project, Washington Physicians for Social Responsibility, Cascadia Wildlands Project, Peace Action of Washington, Mary Fleysteen, and Glen Milner, (collectively, "Ground Zero") maintain that the Navy failed to review the probable significant environmental impacts of an accidental explosion of a Trident II(D-5) missile during operations at Bangor, and failed to consult the National Marine Fisheries Service ("NMFS") regarding the possible effects of such an explosion on threatened salmon species inhabiting the waters adjacent to the Bangor submarine base.
 
 
 2
 * The Navy developed the Fleet Ballistic Missile system during the Cold War as a "survivable retaliatory strike force," in the Navy's terminology, that can be launched from submarines deployed at sea if there is a prior nuclear attack against the United States.[1] The Trident II, or D-5, intercontinental ballistic missile, first deployed by the Navy in 1990, is the sixth and most recent generation of this missile system. The Trident II missile is the replacement for the fifth generation Trident I, or C-4, missile. The Trident I missile was initially deployed in 1979, and is presently being phased out of the Navy's arsenal.
 
 
 3
 The Navy's Ohio, or Trident, class ballistic missile submarine serves as the primary launching platform for the Trident I and II missiles. Each of the eighteen Trident class submarines in the Navy's fleet is equipped to carry and launch twenty-four Trident missiles, and this program is a major part of the United States's strategic arsenal. Two naval bases serve as the home ports for the Trident submarine fleet: Naval Submarine Base Kings Bay, Georgia, located on the Atlantic Ocean just north of the Florida border, and Naval Submarine Base Bangor, Washington, located on the eastern shoreline of the Hood Canal in the Puget Sound Basin, approximately 15 miles west of the city of Seattle and 10 miles north of the city of Bremerton.
 
 
 4
 Naval Submarine Base Bangor ("Bangor") was selected by the Navy in the early 1970's as the first dedicated full-support facility in the continental United States for the Trident I missile system. After a review of eighty-nine potential sites considering both the operational requirements and the environmental impacts of the Trident program, the Navy settled upon Bangor as its prospective site. Upon selection of Bangor, the Navy undertook a detailed assessment of the impacts of Trident program on the community and environment surrounding the base, culminating in issuance of a final Environmental Impact Statement ("EIS") in July, 1974.[2]
 
 
 5
 The Navy supplemented the 1974 EIS four times: once in 1976, twice in 1977, and once in 1978. Both the 1974 EIS and the four supplements considered that the Bangor base could be upgraded at an unspecified future date to accommodate the Navy's conversion from the fifth generation Trident I to the sixth generation Trident II system.
 
 
 6
 In the mid-1980's, the Navy settled on a plan to upgrade eight Trident submarines in the Bangor fleet, originally fitted to carry Trident I missiles, so that they could accommodate the newer-generation Trident II missile. This plan required a corresponding upgrade of the Trident I storage and handling facilities at Bangor to make these facilities compatible with the larger Trident II missile. Because the specifications for the final upgrade plan, the "D-5 [Trident II] Backfit Facility Program" ("Backfit Program"), varied from the conversion assumptions made in the 1974 EIS and its supplements, the Navy in 1989 issued an Environmental Assessment addressing the potential impact of the Backfit Program on the Bangor environment. The 1989 Environmental Assessment incorporated the assumptions drawn in the 1974 EIS, and independently considered only new requirements and impacts not addressed in the 1974 EIS. Based on the analysis in the 1989 Environmental Assessment, the Navy issued a Finding of No Significant Impact, concluding that "the TRIDENT D-5 Upgrade Program at [Bangor] will not have a significant impact on the quality of the human environment."
 
 
 7
 The Navy planned to commence construction on the Backfit Program in 1989, at a projected cost of $248 million. But the sudden end of the Cold War led to a domestic debate on the necessary scope of the Fleet Ballistic Missile system, and resulted in postponement of the Backfit Program. In 1994, following a comprehensive Nuclear Posture Review, President William Jefferson Clinton scaled back Trident operations at Bangor, but determined that the Backfit Program should proceed at a reduced scale. The revised Backfit Program, about one-third the size and one-tenth the cost of the original 1989 plan, commenced in 2000.
 
 
 8
 In light of President Clinton's decision to redesign the scope of the Backfit Program, the Navy reexamined the 1974 EIS and supplements, as well as the 1989 Environmental Assessment. The Navy's review concluded that because the scaled back Backfit Program was a reduced version of the upgrade program first analyzed in 1989, the environmental impacts of the Backfit Program were consistent with and contained in the 1989 Environmental Assessment analysis. The Navy therefore did not prepare further NEPA documentation for the Backfit Program.
 
 
 9
 In March 1999, the National Marine Fisheries Service ("NMFS") listed as threatened under the ESA two fish species found in the vicinity of the Bangor base, the Hood Canal Summer Run Chum Salmon and the Puget Sound Chinook Salmon. In coordination with the NMFS, the Navy reanalyzed the potential impact of the Backfit Program on these threatened species in a series of Biological Assessments. The Navy's Biological Assessments concluded that the Backfit Program would have no adverse effect on these species. The Navy also forwarded the results of these assessments to the NMFS, which did not issue a response. The Navy decided that it did not need to prepare any NEPA documentation in response to the threatened species listing.
 
 
 10
 On June 22, 2001, Ground Zero filed suit in the United States District Court for the Western District of Washington alleging violations of NEPA and the ESA, and seeking injunctive relief against the Backfit Program. On January 17, 2002, the district court granted the Navy partial summary judgment with respect to Ground Zero's claims that the Navy was required to evaluate the environmental impacts of storing and handling Trident II missiles armed with nuclear warheads at Bangor, the environmental impacts of potential terrorist attacks on the base, and the environmental impacts of a possible earthquake or tsunami. After oral argument, the district court on October 28, 2002, granted the Navy summary judgment on Ground Zero's remaining claims. The district court held: (1) that the Navy was not required to publish a new EIS for the Backfit Program because the impacts of the Backfit Program were covered in the 1989 Environmental Assessment and the Navy's decision not to publish an EIS was entitled to deference; (2) that the Navy was not required to publish a supplemental EIS for the Backfit Program; and (3) that the Navy complied with the ESA when it evaluated impacts of the Backfit Program on the threatened salmon species.
 
 
 11
 On this appeal, Ground Zero makes three contentions. First, Ground Zero asserts that NEPA requires the Navy to issue a new or supplemental EIS assessing the environmental risk of an accidental explosion of a conventionally armed Trident II missile during operations at Bangor. Second, Ground Zero claims that NEPA further requires the Navy to assess the environmental impact that would occur from an accidental explosion of a Trident II missile armed with nuclear warheads.[3] Third, Ground Zero contends that the Navy violated the ESA by failing to consult with the NMFS about the potential effect of an accidental Trident II explosion on the threatened salmon species found in Hood Canal waters. We have jurisdiction under 28 U.S.C. § 1291, and we affirm the district court.
 
 II
 
 12
 We review de novo a district court's grant of summary judgment. Sierra Club v. Babbitt, 65 F.3d 1502, 1507 (9th Cir.1995). "We determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied substantive law." United States v. City of Tacoma, 332 F.3d 574, 578 (9th Cir.2003). We may affirm summary judgment on any ground supported by the record. Solomon v. Interior Reg'l Hous. Auth., 313 F.3d 1194, 1196 (9th Cir.2002). Because neither NEPA nor the ESA contains an express provision for judicial review, our review of agency decision-making under these statutes is governed by the judicial review provisions of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A). We may overturn such agency decision-making only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." Id.
 
 III
 
 13
 We first address the NEPA issues.
 
 
 14
 * NEPA requires that a federal agency contemplating action "consider every significant aspect of the environmental impact" of the proposed action, and "inform the public that it has indeed considered environmental concerns in its decision-making process." Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983) (internal quotation marks omitted); see also 42 U.S.C. § 4331. NEPA's purpose is to ensure that federal agencies take a "hard look" at environmental consequences before committing to action. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).
 
 
 15
 Because NEPA is an "essentially procedural" statute, Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), it does not mandate "that agencies achieve particular substantive environmental results," Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 371, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Compliance with NEPA is instead determined on the basis of whether an agency has adhered to NEPA's procedural requirements. Id.
 
 To this end, NEPA provides that:
 
 16
 [A]ll agencies of the federal government shall include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on —
 
 
 17
 (i) the environmental impact of the proposed action,
 
 
 18
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
 
 
 19
 (iii) alternatives to the proposed action,
 
 
 20
 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
 
 
 21
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
 
 
 22
 Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved.
 
 
 23
 42 U.S.C. § 4332(2)(c).
 
 
 24
 The process agencies must follow in carrying out this mandate is outlined in NEPA's implementing regulations. Before undertaking a proposed action, an agency must first prepare an Environmental Assessment, a "concise public document" discussing the need for and alternatives to the action, as well as the environmental impacts of both the action and the potential alternatives. 40 C.F.R. § 1508.9. If the Environmental Assessment reveals that the proposed action will have a significant environmental impact, the agency must further prepare a detailed EIS providing a "full and fair discussion of significant environmental impacts," and informing "decision-makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. Conversely, if the Environmental Assessment leads the agency to determine that the contemplated action will not have an appreciable environmental effect, then the agency may forego the EIS and instead prepare a Finding of No Significant Impact, a document "briefly presenting the reasons why an action ... will not have a significant effect on the human environment." 40 C.F.R. § 1508.13.
 
 B
 
 25
 Ground Zero first contends that the Navy violated NEPA because the Navy arbitrarily and capriciously failed to consider the probable significant environmental impacts that would follow from an accidental explosion of a conventional or nuclear Trident II missile. Ground Zero asserts that the Navy had an obligation to prepare an EIS assessing these impacts before commencing the Backfit Program. Ground Zero further asserts that events occurring after the start of the Backfit Program required the Navy to prepare supplemental NEPA analysis.
 
 
 26
 The Navy's threshold defense is that the decision to deploy Trident II missiles to Bangor, and consequently to implement the Backfit Program, was presidential action embodied in a 1994 Presidential Decision Directive issued by President Clinton. The Navy contends that because NEPA does not apply to presidential action, the Navy was not required to assess the environmental impacts of this decision.[4]
 
 
 27
 The Navy is correct that NEPA's procedural requirements do not apply to presidential action. By its language, NEPA applies to "all agencies of the federal government." 42 U.S.C. § 4332(2). The President lies outside of NEPA's definition of a "federal agency." See 40 C.F.R. § 1508.12 (providing that the term "federal agency" as used in NEPA "does not mean the Congress, the Judiciary, or the President.").
 
 
 28
 We therefore assess whether the decision to deploy Trident II missiles at Bangor and to implement the Backfit Program was one made by President Clinton, or by the Navy. The Navy's contention rests primarily on Presidential Decision Directive Number 30 ("PDD 30"), a largely classified 1994 document that the Navy represents to contain President Clinton's decision to base the Trident II program at Bangor. We do not rely on the Navy's representation of a classified document's contents. Although we would review the classified information in the record if we thought it necessary, we do not do so here because other documents in the record persuade us that it cannot be genuinely disputed that President Clinton used PDD 30 to order the Navy to locate Trident II missiles at Bangor and to proceed with the Backfit Program.
 
 
 29
 The record contains unchallenged statements of two persons intimately familiar with the Backfit Program. These statements establish without equivocation that implementation of the Backfit Program was ordered by the President as Commander-in-Chief. Rear Admiral Dennis M. Dwyer is the Navy's Director of Strategic Systems Programs, and is the manager of the Backfit Program. Rear Admiral Dwyer states in a sworn declaration that in 1994 "the President decided that the Backfit effort at Submarine Base Bangor should go forward but at reduced numbers," and further emphasizes that it was "[t]he President's decision" to implement the scaled back Backfit Program. Marvin J. Frye is Bangor's Environmental Director. Environmental Director Frye states in a file memorandum in the Backfit Program administrative record that in 1994 "[a]s a result of the Nuclear Posture review, the President decided to backfit 4 Ohio class submarines at Naval Submarine Base Bangor with Trident II (D5) missiles. (Presidential Decision Document No. 30). The Navy's Strategic Systems Programs Office then reconfigured the D5 program to meet this executive decision." Environmental Director Frye's memorandum is dated May 7, 2001, nearly a month and a half before the filing of Ground Zero's complaint in the present case.[5]
 
 
 30
 Ground Zero offered no evidence to counter the position that PDD 30 ordered the Navy to undertake the Backfit Program. Ground Zero instead offers the argument that PDD 30 is not of controlling importance because the Backfit Program was originally devised by the Navy, and, under Ground Zero's argument, PDD 30 only ordered that the Navy scale back its original Trident II deployment plan.
 
 
 31
 We consider this argument by Ground Zero to be unpersuasive. It is true that the Navy did conceive the original Backfit Program in the mid-1980's. But it is also true that the Navy took no steps to implement the Backfit Program at Bangor until after President Clinton's 1994 Nuclear Posture Review. The Navy's prior planning for the eventual upgrade of Bangor's facilities to accommodate the Trident II missile in the event of the President ordering future deployment does not decide the issue of whether the Navy had actual discretion in the final decision to site the Trident II missile at Bangor. Because the record unassailably shows that the President made a decision as Commander-in-Chief to site the Trident II missile arsenal at Bangor, whatever had been recommended by the Navy, we are confronting a presidential decision that is not a proper subject of NEPA review.
 
 
 32
 Given the Navy's uncontroverted assertions regarding PDD 30, we hold that there is no genuine issue of material fact that it was the President, and not the Navy, who made the decision to order deployment of the Trident II missile to Bangor. When the President as Commander-in-Chief makes a presidential decision to deploy a weapons system at a particular military installation, the military must follow the President's order and has no ability to disregard it. Accordingly there is no agency decision regarding the President's military directive suitable for review under NEPA.
 
 C
 
 33
 The conclusion that it was the President's decision to order implementation of the Backfit Program does not wholly end our inquiry. Ground Zero contends that regardless of whether the President or the Navy was responsible for the deployment of the Trident II missile, the Navy retained some discretion over the implementation of the Backfit Program at Bangor. The Navy admits that it had discretion over the siting and modification of facilities required for the Trident II upgrade. And, the Navy also has discretion over how to undertake operations involving Trident II missiles, including practical decisions about the storage, transportation, and handling of the missiles located at Bangor, as well as the routine loading and unloading of the missiles from submarines. The remaining dispositive NEPA issue is whether within the purview of this limited discretion the Navy complied with NEPA's procedural requirements. The only environmental impacts that Ground Zero alleges require NEPA review are those stemming from a possible accidental Trident II missile explosion.
 
 
 34
 The Council on Environmental Quality NEPA implementing regulations provide that federal agencies must examine the "reasonably foreseeable" environmental effects of their proposed actions when conducting environmental review. 40 C.F.R. § 1502.16, 1508.8(b). We have "rejected the notion that every conceivable environmental impact must be discussed in an EIS." No GWEN Alliance of Lane County, Inc. v. Aldridge, 855 F.2d 1380, 1385 (9th Cir.1988). We have instead held that "[a] reasonably thorough discussion of the significant aspects of the probable environmental consequences is all that is required by an EIS." Trout Unlimited v. Morton, 509 F.2d 1276, 1283 (9th Cir. 1974). "An EIS need not discuss remote and highly speculative consequences." Id. at 1283; see also Warm Springs Dam Task Force v. Gribble, 621 F.2d 1017, 1026-27 (9th Cir.1980).[6]
 
 
 35
 The Navy has studied the risk of an explosive accident occurring during Trident II missile loading and unloading operations. A Navy study conducted between 1992 and 1996 determined the risk of any accident occurring during these operations to be less than one in one million. And even assuming that such an accident did occur, this study further concluded the risk of the mishap leading to an explosion is between one in 100 million and one in one trillion. The risk of accidental explosion is estimated by multiplying the risk of any accident by the risk that an accident will yield explosion. The product of the probabilities cited in the Navy's report is infinitesimal, and such remote possibilities do not in law require environmental evaluation.
 
 
 36
 Ground Zero raises three arguments to counter the Navy's risk analysis. Ground Zero presents the declaration of an expert, who concludes that the Navy's risk calculations are "unbelievable." This declaration, unsupported by analysis or documentation, does not render the Navy's decision to rely on its study arbitrary and capricious. Agencies are normally entitled to rely upon the reasonable views of their experts over the views of other experts. See Greenpeace Action v. Franklin, 14 F.3d 1324, 1333 (9th Cir.1992) ("To set aside the Service's determination in this case would require us to decide that the views of Greenpeace's experts have more merit than those of the Service's experts, a position we are unqualified to take."); see also Marsh, 490 U.S. at 378, 109 S.Ct. 1851 ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.").
 
 
 37
 Ground Zero contends that the Navy must assess the risk of Trident II accident and explosion in an EIS because the Navy incorporated this risk, however slight, into its planning of Bangor's base layout. However, the Navy's base planning procedures are not relevant for our purposes of evaluating the need for NEPA review. The Department of Defense ("DoD") regulations that govern base planning have different aims and standards than NEPA. The DoD regulations mandate "maximum possible protection" to base personnel, property, and the environment surrounding the base. The Navy may have decided that "maximum possible protection" entailed consideration of remote and speculative risks. But that does not alter NEPA's requirements that agencies assess only "reasonably foreseeable" risks. 40 C.F.R. § 1502.16, 1508.8(b).
 
 
 38
 Ground Zero points to 40 C.F.R. § 1502.22, which requires that agencies discuss "reasonably foreseeable significant adverse effects" where "there is incomplete or unavailable information." This regulation defines as "reasonably foreseeable" "impacts with catastrophic consequences, even if their probability of occurrence is low." Id. Ground Zero interprets this regulation to require the Navy to assess the environmental impact of an accidental Trident II explosion at Bangor because it asserts that such an explosion would have "catastrophic consequences." However, this regulation applies only to effects for which there is "incomplete or unavailable information." As we have previously discussed, the Navy has made detailed study of the risk of an accidental explosion, and has determined this risk to be extremely remote. Upon this conclusion, which is well grounded in the record, NEPA requires no more.[7]
 
 IV
 
 39
 We next address Ground Zero's ESA claims.
 
 
 40
 * The ESA states that a federal agency must ensure that its actions are "not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). ESA section 7 requires that an agency considering action consult with either the Fish and Wildlife Service ("FWS") or the NMFS if the agency "has reason to believe that an endangered species or a threatened species may be present in the area" affected by the proposed action, and "implementation of such action will likely affect such species." 16 U.S.C. § 1536(a)(3); see also 50 C.F.R. § 402.14(a).
 
 
 41
 The ESA's implementing regulations provide exceptions to the formal consultation requirement. 50 C.F.R. § 402.14(b). First, an agency may elect to engage in informal preliminary consultation with the FWS or NMFS to help determine whether the proposed action will result in environmental impacts requiring formal consultation. 50 C.F.R. § 402.13. If, after this informal consultation, the agency and the FWS or NMFS concur that the proposed action is not likely to have an adverse effect on threatened or endangered species, then no further consultation is required. Id. Second, the agency may choose to prepare a Biological Assessment evaluating "the potential effects of the action on listed and proposed species and designated and proposed critical habitat" and determining "whether any such species or habitat are likely to be adversely affected by the action." 50 C.F.R. § 402.12(a). If the Biological Assessment concludes that no listed species or critical habitat is likely to be adversely affected by the planned action, and the FWS or NMFS concurs, then the agency is relieved of the requirement of formal consultation. Id. § 402.12(k)(1).
 
 B
 
 42
 Ground Zero contends that the Navy violated section 7 of the ESA because the Navy did not consult with the NMFS on the potential impact of an accidental Trident II missile explosion on two threatened salmon species that may inhabit the waters outside Bangor. Ground Zero asserts that the ESA required the Navy to consult with the NMFS to ensure that an explosion of a Trident II missile during loading operations at Bangor would not jeopardize the continued existence of these threatened species.[8]
 
 
 43
 We reject Ground Zero's contention first because the Navy lacks the discretion to cease Trident II operations at Bangor for the protection of the threatened species. The regulations implementing the ESA provide that section 7 applies to "all actions in which there is discretionary Federal involvement or control." 50 C.F.R. § 402.03. "Where there is no agency discretion to act, the ESA does not apply." Natural Res. Def. Council v. Houston, 146 F.3d 1118, 1125-26 (9th Cir.1998). As for the environmental implications for the listed species of the basic decision by the President to site the Trident II missiles at Bangor, the requirements of ESA section 7 for the Navy are not invoked; because any consultation by the Navy with NMFS regarding the risks of accidental Trident II explosion on the threatened salmon species, if such risks arise solely from the President's siting decision, would be an exercise in futility.
 
 
 44
 Even when we consider that there are some aspects of the Backfit Program as to which the Navy has discretion in its actions, we must also recognize that Ground Zero's ESA claim rests wholly on the risks of accidental Trident II missile explosion. In these circumstances, we do not think that risks of missile explosion, based on any discretionary acts of the Navy, required additional ESA section 7 consultations because the likelihood of jeopardy is too remote. The ESA requires federal agencies to ensure that agency action "is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). Also, the ESA protects against adverse modification to designated critical habitat of such species. Id. As we have explained, the Navy's prior studies revealed the risk of an accidental explosion of a Trident II missile to be remote, and indeed, the calculated risk is infinitesimal. And so it was not arbitrary and capricious for the Navy to conclude that it was not required to consult with NMFS about the possibility that a Trident II missile explosion would jeopardize the listed salmon or adversely affect their habitat.
 
 V
 
 45
 We affirm the district court's grant of summary judgment to the Navy on Ground Zero's claims. Because the Navy has only limited discretion in the operation of the Backfit Program, and within that discretion the risk of a Trident II missile explosion is remote, NEPA does not require the Navy to issue an EIS assessing the environmental effects of such an accident at Bangor. Similarly, because of the Navy's limited discretion and the remoteness of a possible accidental missile explosion, the ESA did not require the Navy to consult with the NMFS about whether such an accident would jeopardize the continued existence or adversely affect the critical habitat of threatened salmon species inhabiting the Hood Canal.
 
 
 46
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 The record contains excerpts from a Navy website describing the Fleet Ballistic Missile system. A current description of the Navy's Trident system can be found at the Navy's public website, http:// www.navy.mil
 
 
 [2]
 An environmental challenge based on NEPA to this 1974 EIS was rejected by the United States Court of Appeals for the District of Columbia CircuitSee Concerned About Trident v. Rumsfeld, 555 F.2d 817 (D.C.Cir.1976).
 
 
 [3]
 Ground Zero does not seek to require the Navy to document the environmental consequences of a nuclear detonation. Ground Zero rather asserts that the Navy is required to consider the effect of a conventional explosion of the propellant fuel in a Trident D-5 missile dispersing radio-active materials into the environment
 
 
 [4]
 Furthermore, the Navy argues that because the APA does not provide for judicial review of presidential actions, we are without power to review President Clinton's decision to site the Trident II at Bangor. In view of the fact that Ground Zero has not sued the President and in view of our rationale for decision, we need not assess this issue
 
 
 [5]
 On the date of his inauguration, President Clinton issued Presidential Decision Directive Number 1 ("PDD 1"). This document, now declassified, established instrumentalities "to inform[federal government] departments and agencies of Presidential directives." President Clinton stated in PDD 1 his intent "to promulgate Presidential decisions on national security matters" through Presidential Decision Directives. This background further supports the logical conclusion that an executive decision on the deployment of the Trident II missile, an integral part of America's strategic defense arsenal, would be expected to be contained in a Presidential Decision Directive
 
 
 [6]
 For example, we have held that agencies performing NEPA review are not required to consider the environmental consequences of the increased risk of nuclear war resulting from construction of military communications towers,No GWEN, 855 F.2d at 1381, 1386, the environmental effects from the failure of a dam from a catastrophic, but highly unlikely, earthquake, Warm Springs, 621 F.2d at 1026-27, or how remotely possible land-use changes might bear on the environmental effects of a new dam, Trout Unlimited, 509 F.2d at 1283-84.
 
 
 [7]
 The Navy also requested that, in assessing NEPA compliance, we consider the effect of the Supreme Court's recent decision inDepartment of Transportation v. Public Citizen, ___ U.S. ___, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004) (holding that NEPA does not require the Federal Motor Carrier Safety Administration to evaluate the environmental effects of cross-border motor carrier operations because the agency lacked the discretion to prevent those operations). Because our holding rests on alternative remoteness grounds, it is unnecessary to assess the possible effect of Public Citizen. Moreover, because the parties did not address the issue in briefing, we decline without necessity to depart from our customary practice of only considering arguments that are briefed. See, e.g., Koerner v. Grigas, 328 F.3d 1039, 1048 (9th Cir.2003) ("In general, we will not ordinarily consider matters on appeal that are not specifically and distinctly argued in appellant's opening brief." (internal quotation marks and brackets omitted)). We adhere to this approach for sound prudential reasons. See, e.g., Indep. Towers of Wash. v. Wash., 350 F.3d 925, 929 (9th Cir.2003) ("Our adversarial system relies on the advocates to inform the discussion and raise the issues to the court."); Abovian v. INS, 219 F.3d 972, 981 (9th Cir.2000) (Wallace, J., dissenting) ("There is a risk that the court, lacking the analysis ordinarily provided by adversarial parties, will reach the wrong conclusion on the merits and create poor precedent...."). We thus need not express and do not express any view in this case about the impact of Public Citizen on our assessment of the scope of NEPA's requirements.
 
 
 [8]
 The record shows that the Navy consulted NFMS and performed a series of Biological Assessments analyzing the impact of discretionary construction and facility modification portions of the Backfit Program. The Navy's assessments concluded that discretionary Backfit Program operations would have no adverse effect on the listed species, and the NMFS concurred in these conclusions. Ground Zero does not challenge the conclusions of these Biological Assessments